## UNITED STATES DISTRICT COURT FOR
### THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| | **CA No.: 20-11436** |
| **RILEY SOULE,** | |
| *Plaintiff,* | **PLAINTIFF DEMANDS TRIAL BY JURY** |
| **vs.** | |
| **NEW ENGLAND TREATMENT ACCESS, LLC,** | |
| *Defendant.* | |

## COMPLAINT

This action is commenced by RILEY SOULE (hereinafter "Plaintiff") against NEW ENGLAND TREATMENT ACCESS, LLC (hereinafter "NETA" or "Defendant") to remedy and seek relief for unlawful employment practices arising under *Title VII of the Civil Rights Act of 1964,* 42 U.S.C. §§ 2000e-2, § 2000e-3 ("Title VII"), *Title I of the Americans with Disabilities Act 42 U.S.C. §§ 12112, 12203 (ADA)* and The Massachusetts Fair Employment Practices Act, M.G.L. c. 151B (151B).

## PARTIES

1.   Plaintiff presently resides in the city of North Providence, county of Providence, within the State of Rhode Island and formerly worked for Defendant at its Massachusetts location.

2.   NETA, LLC is, upon information and belief, a foreign domestic non-profit corporation doing business in the State of Massachusetts with a principal place of business located in the city of Franklin, county of Norfolk, within the Commonwealth of Massachusetts.

## JURISDICTION AND VENUE

3.   This Court has jurisdiction to hear the Complaint pursuant to 28 U.S.C. § 1331.

4.   This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §
     1367.  Plaintiff's state claims are so related to Plaintiff's federal claims that they form part of the
     same case or controversy.  Consideration of judicial economy, fairness, and convenience warrants
     this Court's exercise of supplemental jurisdiction over Plaintiff's state law claims.

5.   Venue of this action lies pursuant to 28 U.S.C. § 1391(b) because Defendant conducts business in
     Massachusetts within the judicial district of this Court, as well as because the alleged unlawful
     practices occurred and/or continue to occur within the state of Massachusetts within the judicial
     district of this Court.

## ADMINISTRATIVE PROCEDURES

6.   On or about November 18, 2019, Charges of Discrimination were timely filed with the
     Massachusetts Commission Against Discrimination (MCAD) and co-filed with the Equal
     Employment Opportunity Commission (EEOC).

7.   On or about May 12, 2020, MCAD issued its withdrawal of jurisdiction (MCAD N0.20-BEM-
     00137; EEOC NO. 16C-2020-00733) with the EEOC Notice of Right to Sue issued subsequently,
     enabling this private civil action to be filed.

8.   This Complaint was timely filed after issuance of the withdrawal and Right to Sue.

## FACTUAL ALLEGATIONS

9.   Plaintiff is a transgender female who is a US Army combat veteran from the 1-505[th] Parachute
     Infantry Regiment 3rd Brigade Combat Team, 82nd Airborne Division.

10.  During Plaintiff's military service she experienced both sexual assault and combat trauma, which
     resulted in Post-Traumatic Stress Disorder (PTSD) by 2013 when she left service; Plaintiff has
     also suffered at least 10 traumatic brain injuries, a contributing factor to her PTSD.

11.  Plaintiff's has been treated for PTSD since the time she left service; in October 18, 2018, the
     military recognized that Plaintiff was 50% disabled due to PTSD.

12.   With her diagnoses of PTSD, as well as the related conditions of anxiety and depression, Plaintiff is a person with a disability because she has a mental impairment that substantially limits one or more major life functions such as concentration, memory, and coping with stress.

13.   Because of Plaintiff's disabilities, she experiences severe panic attacks, generally stemming from being touched or startled, which affects her ability to cope with certain stressful situations; additionally, Plaintiff has related difficulty with loud noise sensitivity.

14.   However, when working conditions are reasonably non-distracting and quiet, her concentration is not a problem and she has been complemented by NETA for her attention to detail.

15.   NETA coworkers, supervisors, managers and HR all knew Plaintiff had mental at all times relevant because she was treated for PTSD (and related depression/anxiety) actively while at NETA and Plaintiff has shared the same with her manager/supervisors openly.

16.   Plaintiff was hired onto the security team at NETA in April 2017 by manager Steve Coraccio.

17.   At all times relevant, Plaintiff met or exceeded NETA's reasonable expectations.

18.   Plaintiff worked on the security team from April 2017 to November 2018; in November 2018, Plaintiff was granted a new job in inventory as an Inventory Specialist.

19.   Plaintiff was commended for her work by Mr. Coraccio (security manager/supervisor), Dave Ovalman (head of production) ("Mr. Ovalman"), and Chris Samuel (security team lead) ("Mr. Samuel") weekly when she was working in security.

20.   Similarly, as an Inventory Specialist, Plaintiff was complemented for her work by her manager Wes Amoling ("Mr. Amoling") and her supervisor Ava Saster ("Ms. Saster"), such as them stating to Plaintiff "good catch" and "good job," and she was commended for going above and beyond with cleaning and on her project work.

21.   Additionally, from the start of her employment until coming out as transgender female part-way into her employment at NETA, Plaintiff received notable pay increases.

22. During her employment, the NETA work culture was sexist – a "boys club" – and employees, including managers and HR, displayed very negative gay and transgender phobias; management and HR tolerated negative comments about gay and transgender persons, as well as women.

23. During her employment, NETA also had a culture which did not respect disability accommodations; for example, security footage of Hanna Koerner ("Ms. Koerner") was reviewed to time her breaks unfairly, while other employees like Samantha Chamberlain were retaliated against after being given accommodations where coworkers would call her a "lazy bitch" and harass her about "faking" her disability to get the first shift.

24. During her employment, the leads (supervisors), managers, and members of HR were notified of the sexist, homophobic, transgender, and disability-related harassing comments and often even witnessed it, yet nothing was done.

25. In fact, there are multiple examples of persons who reported sexual harassment, disability-based harassment, or transgender/gay-related harassment who were pushed out or terminated including Alexandra Sheehan, Esme de Verney, and Brittany Lainhart; later this happened to Plaintiff.

26. During her employment, coworkers, supervisors, and managers, frequently discussed women in a sexual manner, such as Matt Saudade, Steve Derosier, her team lead Mr. Samuel, Daniel Arruda (Compliance Officer), and Patrick Barlow (Director of IT); for example, Compliance Officer Daniel Arruda frequently brought up Sarah S. who he said dressed "sluttily" and had "an amazing body," Mr. Samuel, Plaintiff's team lead, commented that he "would love to hit that," and Steve Derosier discussed which was the "hottest" girl at NETA; these comments offended Plaintiff.

27. During Plaintiff's employment there were explicit, offensive comments about transgender persons which made Plaintiff keep her transgender transition private as long as she could.

28.  One example of the openness at which employees bashed and harassed transgender persons occurred while Plaintiff was unloading a truck of growing blocks, while coworkers Chris Brodka

and Greg Cotes had the following discussion about transgender women: Chris said "[d]id you see that tranny on that show," Greg and Chris proceeded to put down being "politically correct" about "transgenders", discussed in a derogatory manner what transgender people were called, and then discussed the actual gender of a transgender person, stating "a dude in a dress is still a dude in a dress"; Greg also stated "[i]f you have a dick, you're a dude."

29. In April of 2018, Plaintiff, who still presented as a male at that time, had her one-year review, administered by Mr. Coraccio and Mr. Samuel; Plaintiff was told she was being groomed for first shift, doing openings, to be given extra responsibility.

30. Additionally, Steve informed Plaintiff that they "had fought for the highest raise [they] could give [Plaintiff]" because of her great work; her salary increased from $15.50/hr to $16.25/hr.

31. In May of 2018, and the Director of IT Patrick Barlow ("Mr. Barlow") offered Plaintiff a job working for him; he said he would have to post it internally but that "no one was really qualified [at NETA]" and that the position "was [Plaintiff's] if [she] wanted it" because she was qualified.

32. However, within a month or so, by June of 2018, Plaintiff's transition to a female became public, and she was then was "outed" by HR at work; at that point, everything changed.

33. For example, Mr. Barlow did not give Plaintiff the job; a less qualified worker was hired.

34. Plaintiff's coworkers and managers began speculating about Plaintiff's gender identity; coworkers such as Adriana Cardona informed Plaintiff that employees were talking about her.

35. Then, on or about July 25, 2018, Kleona Mihal, an HR representative ("Ms. Mihal"), noticed Plaintiff's gender marker was female after Plaintiff changed it legally on her ID.

36. Without permission, Ms. Mihal stated she needed to tell one of Plaintiff's bosses, Steve Corracio; she also told Plaintiff she had to speak to Anne Joyce ("Ms. Joyce"), head of HR.

37. Plaintiff left and cried in the bathroom because she was not ready to come out at work.

38. Anne Joyce, the head of HR at NETA, directed Plaintiff to meet her the next day.

39. The next day, July 26, 2018, Ms. Joyce first stated to Plaintiff that she "wanted to be careful" as she had "only dealt with this once before at her old company and had handled it poorly."

40. Ms. Joyce then asked Plaintiff "where [she was] in [her] transition."

41. Ms. Joyce informed Plaintiff that she was the first person to transition while working at NETA.

42. Plaintiff told Ms. Joyce that she wanted to be referred to as Riley, with female pronouns, and to switch locker room facilities.

43. Ms. Joyce responded that her chosen name and pronouns were fine, but switching her to the female facilities was "complicated" and challenging because "[Plaintiff] looked like a girl right now, but [Ms. Joyce] did not know what [Plaintiff] looked like once [she] took [her] clothing off"; Ms. Joyce also asked if Plaintiff had "the surgeries," referring to Plaintiff's genitals.

44. Plaintiff politely responded that it was not acceptable to ask her about her surgeries or medical information related to her transition; nonetheless, Plaintiff explained that due to HRT for almost a year, "[she] had breasts" and was "uncomfortable changing in the men's facilities."

45. Ms. Joyce responded that Plaintiff should "just face away from men" while changing so they could not "see anything" or Plaintiff could "wait until they left the locker room."

46. Plaintiff responded that she was already doing that but she was very uncomfortable and she was never alone in the locker room.

47. Notably, Massachusetts state law has required the allowance that transgender persons use the bathroom/locker room that matches their gender identity for years prior to this time in 2018.

48. Then, without asking Plaintiff's permission or discussing it, Ms. Joyce called Plaintiff's boss Mr. Coraccio on speaker phone and explained that Plaintiff "had something to tell him."

49. Before Plaintiff could say anything, she was forcefully outed to her boss.

50. Then, at the end of the meeting, Ms. Joyce still directed Plaintiff to use the men's facilities because the women's facilities were "crowded."

6

51. Of note, Ms. Joyce also told Plaintiff that NETA was working on a gender-neutral bathroom which was never finished while Plaintiff was working there.

52. Plaintiff then complained that Ms. Joyce had just been "outed" Plaintiff against her wishes.

53. Ms. Joyce did not apologize and started to discuss Plaintiff's coming out plan.

54. Ms. Joyce agreed to not share her transition until Plaintiff had shared it with managers herself; it was also agreed that Plaintiff's medical information related to her transition would not be shared.

55. After the meeting, Plaintiff had her NETA ID changed to her name and she took a new ID photo, as Ms. Joyce had also agreed to a new ID.

56. However, when Plaintiff got to work on July 30, 2018, her old badge (old picture with a beard and old name) was waiting for her instead of the new badge with "Riley" and a new picture on it.

57. Plaintiff raised this concern to Mr. Samuel as Plaintiff came through security that day, but he just shrugged, and then directed Plaintiff to change in the *men's room*, then to go see HR after that.

58. On her way to HR, Plaintiff was stopped by Dave Ovalman, one of the top leaders at NETA, who indicated he knew of her transition even though Plaintiff had not come out to him as agreed with Ms. Joyce; in other words, NETA disclosed this information without consent.

59. Once at HR, Plaintiff asked Anne Joyce how Dave Ovalman knew about her transition and Ms. Joyce stated she "had to loop him in"; Plaintiff complained that was not their agreement.

60. Plaintiff also complained that her NETA ID still had her old name and photo.

61. Ms. Joyce stated that the ID had to have her legal name.

62. In response, Plaintiff told M.s Joyce that other employees had nicknames that were not their legal name on badges including Alexandra Sheehan, shortened to Allie Sheehan and Adam Greenie, changed to A.J. Greenie; Ms. Joyce denied knowledge of these badges with nicknames.

63. Plaintiff told Ms. Joyce that she felt the differential treatment was discriminatory.

64. Ms. Joyce did and said nothing in response to that complaint of discrimination; worse, Ms. Joyce informed Plaintiff she could only use the women's locker room when "no women" were in there to not "upset any of the female employees," or, that Plaintiff could use the men's locker room.

65. Plaintiff complained that she "was a woman" and "felt discriminated against" by Ms. Joyce's statement that Plaintiff's use of that bathroom would upset "the female employees."

66. Ms. Joyce did nothing in response to the additional complaint of discrimination by Plaintiff.

67. Plaintiff left that meeting with Ms. Joyce, head of HR, feeling ostracized due to her transition.

68. Soon after this, in very early August of 2018, Plaintiff was approached by Anne Marie Blood ("Ms. Blood"), a subordinate of Ms. Joyce in HR, who said she was "taking over [Plaintiff's] *situation*" because she "understood" her transition since she had a (minor) transgender son (who she inappropriately shared with Plaintiff was about to start testosterone).

69. Ms. Blood promised Plaintiff that they would both talk to the team leads in person to inform them of Plaintiff's name / pronouns, then the leads would disseminate the information to the staff *after* that; Plaintiff emphasized that she wanted to tell her own managers and coworkers first and they agreed again that the sharing of medical information would not occur.

70. On or about the next day, August 6, 2018, as Plaintiff walked through her workplace her coworkers, using her new name and pronouns, congratulated her on "finally being out at work", and one coworker, Esme du Vernay, hugged Plaintiff stating he was proud of her.

71. Given that Plaintiff had not authorized the sharing of her transition that soon and without her knowledge, Plaintiff was shocked.

72. Plaintiff was informed by employees, including a supervisor, Alexandra Sheehan, that all of the team leads had been informed by management/HR *in email;* Plaintiff was told the supervisors/leads were instructed to call a morning meeting with all staff to tell all employees *not just that* Plaintiff was transgender, but also about her medical information such as being on HRT.

73. Other coworkers confirmed to Plaintiff that *all other team leads* had *also* held meetings that morning sharing Plaintiff's transgender status and her private medical information.

74. None of this sharing was authorized by Plaintiff; thus, NETA violated Plaintiff's right to privacy.

75. Further, unauthorized sharing of a transgender person's medical information is harassment/discrimination based on Plaintiff's gender-identity.

76. Plaintiff thus complained to Ms. Blood about NETA staff being told without her authority.

77. Plaintiff also complained she never authorized the sharing of her private medical information, such as that she was on HRT, to be disseminated to all leadership and all staff.

78. Ms. Blood did and said nothing in response to this complaint such as start an investigation.

79. Two days later on August 8, 2018, Plaintiff emailed Ms. Blood complaining that she still needed a female uniform; Ms. Blood did not even respond to Plaintiff until August 17, 2018.

80. Plaintiff did not receive her uniform until October of 2018.

81. When Plaintiff did receive her uniform, it was a mix of men's and women's uniform parts, which were distinctly different from each other; this was not remedied for a long time despite complaints.

82. Around the same time, Plaintiff also first started to complaint about her PTSD being triggered at work such as when John, a per diem security officer, loudly watched violent videos of people getting killed, including many by military convoys exploding due to IEDs at work.

83. Plaintiff reported this action to Mr. Samuel as triggering her PTSD but he did not stop it.

84. In late August 2018, Plaintiff reported to Ms. Mihal of HR that she had legally changed her name and submitted her temporary license so she could get her IDs changed.

85. When Plaintiff received her new RMD license, it still had her old picture with a beard.

86. Plaintiff complained to HR and asked Ms. Mihal to call the state to fix it.

87. Ms. Mihal informed Plaintiff that NETA failed to submit her picture to the Department that handled the license and she would now have to wait until 2019 to change the picture.

88.  This made no sense as Plaintiff had supplied NETA a new picture for her RMD license and the regulations required that her picture look like her, but it was still not changed.

89.  Ms. Mihal said she would look into it with the higher ups but after checking, denied Plaintiff's request because the higher ups were "not going to re-submit the paperwork."

90.  After Plaintiff's continued complaints, Mihal promised to look into it again and never did.

91.  Notably, in 2019 when Plaintiff's RMD license expired, her new ID *again* had her old photo (a male with a beard) because NETA failed to supply Plaintiff's new photo a second time.

92.  Despite instructions to the contrary, many of Plaintiff's coworkers misgendered Plaintiff, calling her a "him"; these coworkers did this intentionally as a way to harass Plaintiff because of her gender-identity, and it was done at a frequency of several times per week from that time in mid-2018 until July of 2019, her last day of work before her separation.

93.  For example, in September of 2018, Plaintiff's coworker Eloy Tee ("Mr. Tee") referred to her as "bro"; Plaintiff, thinking it was an honest mistake, joked "it's actually sis lol" and he responded "okay"; later Mr. Tee did it again after Plaintiff formally informed him that she needed to be called a "her," Mr. Tee continued to do this until Plaintiff's last day of work in July 2019.

94.  Similarly, the team lead in cultivation, Will Remington III, and the cultivation manager, Brian Bart, intentionally referred to Plaintiff as he, him, his, sir, bro, dude, and man, intentionally harassing her and did so consistently, weekly, until her last day of work in July of 2019.

95.  Additionally, Matt Lowther, the head of production, continually used male terms for Plaintiff as well, despite Plaintiff correcting him and directly asking him to "please stop"; like other gender-identity related harassment, this also continued until Plaintiff left NETA in July of 2019.

96.  Plaintiff reported all of the above to Mr. Samuel who said he would look into it; still no swift remedial action was taken and no investigation was ever commenced.

97. Plaintiff continued to report these harassing comments through 2018 and 2019, until her last day in July 2019, to managers, supervisors, leads, and HR; nothing was ever done.

98. By October 18, 2018, Plaintiff's condition of PTSD was formally recognized by the military; specifically, Plaintiff was deemed to be 50% disabled due to PTSD by the military.

99. In October of 2018, Plaintiff took a lateral move to get away from the cultivation crew who harassed her about her gender identity.

100. Around that same time, in or around October of 2018, coworkers started to touch and interrupt Plaintiff intentionally; Plaintiff asked them to stop due to her PTSD and in response, they started to intentionally sneak up behind her and yell "Wooo!" six inches from her ear.

101. These acts of harassing Plaintiff by intentionally startling her, interrupting her, and yelling around her, was done because of Plaintiff's PTSD; this continued through July of 2019 as well.

102. Plaintiff reported these acts to NETA, specifically to her supervisors, managers, and HR; she specifically reported that being touched, startled, or interrupted were problematic due to her disability of PTSD but nothing was done by NETA, including no investigation or remedy.

103. However, in response to Plaintiff's complaints, NETA staff, then supervisors and management, began targeting and harassing her about not being happy/friendly enough.

104. Plaintiff began to come across as more depressed at work due to all of the aforesaid events which in turn increased the harassment of Plaintiff to "smile."

105. Coworkers would tell her to smile, even when Plaintiff explained she was going through mental health challenges related to her disability and after asking them to stop; telling Plaintiff to smile became the next thing that coworkers harassed Plaintiff about due to her disability.

106. From this time through May of 2019, coworkers, including new ones, jumped on the bandwagon of incessantly telling Plaintiff to smile, causing Plaintiff increased distress at work.

107. For example, Rachel Richards put sticky notes with the words "remember to smile" throughout Plaintiff's work area several times per week; this also continued until Plaintiff's separation.

108. Plaintiff reported these behaviors to her supervisors, managers, and eventually HR to no avail.

109. In early 2019, an internal position for lead was posted and Plaintiff applied.

110. Due to all of the coworkers yelling, harassing her about smiling, deadnaming and misgendering Plaintiff (gender-identity harassment), as well as due to coworkers intentionally interrupting and touching Plaintiff their own amusement, Plaintiff began making mistakes in her work at times.

111. On one occasion in or about mid-February 2019, Plaintiff made a mistake in printing a second set of labels; in reality this was the packaging department's error in sending duplicate requests, however, as it was Plaintiff's responsibility to double check labeling projects and while doing so, she had been distracted and failed to discover the erroneous duplicate order from the packaging department.

112. Plaintiff expressed to her manager Mr. Amoling, as she had before, that the interruptions and distractions from coworkers were sometimes causing her to make errors and asked for his help.

113. Mr. Amoling confirmed that the error was because of the packaging department and thus told Plaintiff that "it was not a big deal" and that Plaintiff was not in trouble; Mr. Amoling did not address the concerns Plaintiff raised about interruptions by several coworkers and mistakes.

114. However, soon after, Plaintiff found herself written up – *with a second-level disciplinary action of a written warning rather than a first level notation of conversation*.

115. Upon information and belief, Plaintiff had become a "problem" employee due to the protected acts of complaining about her coworkers and her supervisors/managers' failures to remedy the problems; retaliation thus began to ensue.

116. In the discussion of the write-up, Plaintiff expressed shock and concern that she was written up for a mistake that Mr. Amoling had expressly stated was "no big deal" and was caused by a different

department; of importance, it was also the kind of mistake that similarly-situated non-transgender, non-disabled, non-complaining employees made and were not written up in response to.

117. Also, similarly-situated non-transgender, non-disabled, non-complaining employees were first given a "notation of conversation" corrective action, which is specified as the first-level corrective action on the corrective action forms and *in the employee handbook*.

118. Instead, Plaintiff's first corrective action – in approximately two years of flawless work and work-behavior – was the second-level written warning.

119. Additionally, Mr. Amoling had included on that write-up a prior unknown "error" which was a barcode that Mr. Amoling himself knew had passed through several quality checks and was working, raising the question of if the barcode was even defective to begin with.

120. Specifically, Plaintiff had printed one and scanned it, as well as had another inventory specialist scan it, and it worked; she then printed the rest.

121. Then, the formal quality checking process at NETA included that barcode was first printed by Plaintiff and first quality checked by her, then by the packaging department, then by a different inventory specialist, then by the vault personnel, and then a final quality check at the dispensary.

122. At the vault, Plaintiff even witnessed Chris Ash scan the barcode which scanned just fine; moreover, all of those quality checks found the barcode worked or it would not have made it to the dispensary where it was suddenly found as faulty according to Mr. Amoling.

123. Despite the unlikeliness of this error being attributable to Plaintiff, or even being an error, Mr. Amoling used the "error" to justify a second-level *written* warning.

124. Similarly-situated, non-transgender, non-disabled employees were not treated this way.

125. Moreover, the second-level write-up included "infractions" for Plaintiff having a "negative attitude", yet no one had spoken to Plaintiff so she had no idea what this was in reference to, other than her being upset by coworkers continuing to harass her about smiling incessantly.

126. Lastly the write up also mentioned the act of "white board misuse" for Plaintiff writing "Riley was Here," "Riley was here again," and "Print Labels, Count Stuff."

127. In actuality, the "Print Labels, Count Stuff" was in reaction to joking around with top executive Dave Ovelman when a whiteboard near Plaintiff's desk fell and Mr. Ovelman jokingly wrote "Hang Whiteboard" on the whiteboard; in response, and with Mr. Ovelman's encouragement and full support, Plaintiff wrote "Print Labels, Count Stuff" and they laughed.

128. Moreover, the "Riley was Here" and "Riley was Here Again" was written on the vault whiteboard when Plaintiff dropped product off and no one was in the vault to receive it; "Riley was Here (Again)" was written on the whiteboard in the vault for the same reason along with the product she was dropping off which was left directly in front of the white board.

129. In other words, the use of the whiteboard was either for fully legitimate work purposes of informing vault staff where product had come from or was done in jest with the encouragement and participation of a senior leader.

130. Similarly-situated, non-transgender, non-disabled employees were not given a second-level write-up for legitimate work activities and joking with the encouragement of leadership.

131. Due to having the sudden written warning, Mr. Amoling told Plaintiff that she no longer was qualified for, and could not be interviewed for, the lead position that she had applied for.

132. At that same time, in a meeting with HR's Ms. Blood and Mr. Amoling, Plaintiff again reported the intentional interruptions and harassment that had become a pattern with Plaintiff's coworkers.

133. Ms. Blood's response was to simply state "use a notepad" to address the reported intentional interruptions, ignoring the entire point that coworkers were intentionally harassing Plaintiff.

134. Then, in or around the same time, NETA hired an employee named Don, according to NETA on February 14, 2019, and he immediately[1] began harassing Plaintiff by commenting on her appearance, her body, her hair, and frequently finding her at work, incessantly talking to Plaintiff, and making Plaintiff very uncomfortable.

135. Don also followed Plaintiff around[2] and was always present where she was, which made her even more uncomfortable.

136. Further, Don would wait outside of the bathroom for Plaintiff while she was using it and on the first instance of Don doing this, in or about February 2019, Don actually opened the door and when Plaintiff replied, "I'm in here, using the bathroom," he repeatedly demanded Plaintiff identify herself, despite Plaintiff telling him to leave.

137. Plaintiff reported this event to Ms. Saster who stated she would report it to management.

138. However, Don's behavior continued; Don would then wait outside the bathroom and locker room until Plaintiff came out and tried to talk to her then nearly, if not actually, daily.

139. Plaintiff also reported these incidents to Ms. Saster and Ms. Saster promised she would talk to leadership "again" but Don's harassment still never stopped.

140. Additionally, on a near-daily basis, Don would make comments such as "I've never seen you with your hair up, you look nicer/prettier with it down," "why are you wearing a baggy sweatshirt right now, it's so warm, you must be sweating right now…it would look cuter without a baggy one on," and how he "hadn't seen [Plaintiff] in leggings but [he] thought [she] looked good in them" and that Don "liked seeing [her] in leggings."

---

[1] In her charges this date range of Don's harassment starting was erroneously noted as January/February; the correct timeframe was February/March.

[2] Notably, on the last serious event at NETA, which was captured on videos, some of the videos show that after the incident where Don approached Plaintiff in her work area and cornered her causing Plaintiff to have a panic attack, that 15 seconds later Don follows Plaintiff into the breakroom, then out of the breakroom and down the hallway very close to her, and even is shown reaching out to grab her buttocks as she passed by him near the exit of the breakroom.

141. At first Plaintiff asked Don to stop making comments about her appearance as it made her uncomfortable but he did not stop.

142. Notably, these comments, which occurred from February thorough May of 2019, were often made in front of others, including supervisors/leads, and were always reported to Plaintiff's supervisor Ms. Saster, her manager Mr. Amoling, and other supervisors, managers, and leaders such as:

   a. The "leggings" and "looking good" comments were made in front of (at the time) team lead Steve Finney; later that night Plaintiff further complained to Mr. Finney that Don made such comments regularly which gave her panic attacks and soon after reported this to both Ms. Saster and Mr. Amoling who said they would handle it but did nothing.

   b. Plaintiff also reported the "baggy sweatshirt/look cuter without" comment immediately to Mr. Amoling and also to Ms. Saster who again did nothing.

   c. Plaintiff also reported the hair-related comments, about how it would look prettier or nicer with it down, to Mr. Amoling and Ms. Saster; they did nothing.

   d. Felicia, another team lead, witnessed one of these comments and gave Plaintiff a disgusted look in response to the comment, recognizing its inappropriateness.

143. Understandably, as time went on into March and April of 2019, Plaintiff also reported to Ms. Saster, her supervisor, that she was feeling "very unsafe at NETA due to Don".

144. Notably Don was being reported for much less serious behavior while Ms. Saster and Mr. Amoling ignored Plaintiff's complaints; for example, Adam Freed, a high-level Operations Manager, had been told about *other* complaints by staff related to Don *interrupting* workers, which he addressed in email to Don's supervisor, while Ms. Saster and Mr. Amoling did nothing in response to Plaintiff's several complaints of Don harassing her with comments.

145. More specifically, Adam Freed wrote an email on or about March 21, 2019, stating that "two different staff members came up to me today mentioning that he had been distracted [sic] them

while they are working. The same has been true for me – I'll be working late and he will start talking to me. I do not want to be rude – just wanted to mention it to y'all."

146. Ms. Saster and Mr. Amoling did not take any action in response to Plaintiff's complaints.

147. Further, in or about March of 2019, Plaintiff expressly reported to Mr. Amoling that Don was so distracting he was causing Plaintiff to make mistakes; Plaintiff stated that she "wanted it to stop."

148. Also, into March of 2019, other coworkers increased their intentional harassment because of Plaintiff's disability; for example, Samir Addo ("Mr. Addo"), a team lead, escalated the screaming of "WOO!" in Plaintiff's ear despite Plaintiff asking him to stop due to her PTSD.

149. Then, following Mr. Addo's lead, the packaging team started screaming "WOOO!" at Plaintiff.

150. From March 2019 through July 2019, yelling "WOOO" at Plaintiff, in her ear, and in front of Plaintiff, intentionally, was a common pastime for coworkers and supervisors/leads.

151. Those leads/supervisors partaking in the harassing action included Tim Hannah (packaging supervisor), Basil, Ray, John (all packaging team leads), Mike Viollette (IS team lead), in addition to Mr. Addo (joint roller team lead).

152. Steven Finney, a lead at the time, witnessed this but did not partake in the "Wooo" harassment.

153. Plaintiff reported all of these triggers of her PTSD to her supervisor/managers and to HR; in response there was no investigation, no write-ups for the harassing employees, and nothing done.

154. Also in March of 2019, Plaintiff expressly reported to Mr. Amoling, again, that Don had stated that she "looked really good" and he was "still making [her] uncomfortable"; Mr. Amoling, again promised he would take care of it but did nothing.

155. Also in or around this time in March of 2019, Plaintiff began to be criticized by leads for being "hostile" when in reality, Plaintiff was reacting to intentional acts of gender-identity harassment and disability-harassment such as Team leads Ray, John, and Basil intentionally touching Plaintiff or waiving hands in her face rather than write questions in the agreed-upon notebook.

17

156. In early April 2019, Don was particularly distracting and upsetting to Plaintiff in times that were subject to mistakes such as converting products with SKUs in her head; one time while doing so, Don started commenting about her body, which led to error.

157. In one instance, Don was commenting about how nice Plaintiff looked in her leggings which shocked and distracted Plaintiff, leading to an error she did not catch right away.

158. Likewise, in another example while Don was commenting on Plaintiff's hair, with supervisor Felicia in the room, and Plaintiff clicked the wrong data to fill a form template and did not notice.

159. On April 11, 2019, Plaintiff was made to meet with supervisors/managers and HR again.

160. During that meeting, Plaintiff re-reported to Mr. Amoling and Ms. Blood that the coworker harassment continued including that more had now started to tell her to smile, waive their hands in her face, were repeatedly tapping her shoulders, yelling "Wooo!" and making harassing comments such as those Don was making which she complained caused her to make errors.

161. In this meeting, Plaintiff also first formally requested a disability accommodation; Ms. Blood failed to engage in an interactive process.

162. Moreover, in this meeting, Plaintiff specifically told Mr. Blood of HR and Mr. Amoling, Plaintiff's manager, that Don's harassment and interruptions were causing her "mental health suffering."

163. Mr. Blood and Mr. Amoling's response was *that was Plaintiff's problem*, and since they stated they had "already talked to him" and it was "unlikely" he was still "bothering" her.

164. During that meeting, Plaintiff was again suddenly written up for the two errors caused by Don's distraction and one error related to a *known new problem* with the label tested-on date mistakenly printing as 1899, which was happening to others as well.

165. As to the 1899 mistake, it was a software error so recently discovered that it was not yet on the quality forms at that time; it would occur sometimes when the employee loaded in the data which was supposed to change the 1899 date to the proper date and the software was malfunctioning.

166. Thus, this write-up was for two acts resulting from the continually reported problem of Don interrupting Plaintiff by sexually harassing her and one "mistake" occurring to others.

167. Moreover, that write up was only her second ever at NETA, in approximately two years, with no first "notation of conversation," yet it was listed as <u>her last and final warning</u>.

168. Similarly-situated non-disabled, non-transgender employees are not given a last and final on their second warning ever or given a last and final write-up for these types of alleged work errors.

169. In fact, only minutes after returning from the meeting where she was written up, Mr. Amoling approached Plaintiff's coworkers Grant Linnehan ("Grant") and Mike Tweedly ("Mike") to talk across the hall; Plaintiff heard laughing and both coworkers returned with an upbeat mood.

170. When Plaintiff asked what happened, Grant informed her that Mr. Amoling wanted to discuss *labeling errors* with them *so he would "not have to put them down on paper*."

171. Plaintiff told Grant that Mr. Amoling had just written her up for a particular labeling error – a 1899 mistake; Grant stated that mistake was brought up for him too but he was not written up.

172. On April 17, 2019, days after this meeting, Plaintiff contacted Dave Ovalman, senior leadership at NETA, stating that she had concerns.

173. Plaintiff spoke to him on April 23, 2019, and reported that she was being targeted since complaining to Mr. Amoling, Ms. Saster, and Ms. Blood about coworker harassment and that she received her second write-up for the same mistakes that coworkers were not punished for.

174. Mr. Ovalman stated that Mr. Amoling was "not that type of person" to target her but promised to "look into it" and "get to the bottom of it" and stated he would follow up with Plaintiff.

175. In that meeting, Plaintiff explicitly complained to Mr. Ovalman about Don's harassment and stated that Don's comments were "negatively affecting [her] and [her] work performance"; she also explicitly shared her diagnosis of PTSD, the ongoing coworker harassment, and the harsh, disparate treatment by Mr. Amoling and Ms. Saster which were all "throwing [her] out of wack."

176. Mr. Ovalman did not respond to her report of harassment and retaliation.

177. Instead, he only asked Plaintiff (inappropriately) how she got PTSD.

178. Mr. Ovalman never followed up, no investigation was started, and nothing was remedied.

179. In response however, Mr. Ovalman began to treat Plaintiff negatively himself.

180. For example, prior to Plaintiff's report to Dave, he would say goodbye to her at the end of the day regularly, but stopped doing this right after Plaintiff complained to him.

181. On April 25, 2019, Plaintiff received her new RMD license which had her new name but *still* had the photo presenting Plaintiff as a man with a beard which NETA promised would be fixed.

182. Plaintiff emailed Ms. Mihal and she *again* said she would investigate it but did not; through Plaintiff's remaining employment, Ms. Mihal never responded and the license was never fixed.

183. On May 2, 2019, Plaintiff checked the Franklin MIP Inventory Specialist Nightly Email for directions and saw one of the team leads had written "SMILE!" under "other reminders"; this was intended to harass Plaintiff.

184. Due to these events, Plaintiff had frequent panic attacks at work and her depression worsened.

185. Additionally, Don continued to make harassing comments to Plaintiff, wait outside of the bathroom, seek her out, follow her/end up where she was, and intentionally interrupt her.

186. On May 6, 2019, as Plaintiff was getting ready for work, she was overwhelmed with suicidal thoughts; she decided to take all of her medication and jump off the bridge on Highway 99.

187. Plaintiff told her partner Remi that she was planning to commit suicide and Remi followed the plan created by Plaintiff's doctors in such an event which is common with PTSD.

188. At the VA hospital, Plaintiff was admitted for inpatient care; Remi contacted Ms. Saster.

189. While Plaintiff was still being admitted, Ms. Blood called Remi who told Ms. Blood Plaintiff was in emergency and she could not talk but Ms. Blood stated she had to talk right then to "handle [Plaintiff's] leave correctly."

190. Still while Plaintiff was being admitted to the hospital, Ms. Blood kept Remi on the phone asking inappropriate questions about Plaintiff's suicidal thoughts, Plaintiff's PTSD, and her private medical information; Ms. Blood stated the information was to "assess how long she might need leave for" and kept asking when Plaintiff would return to work which, Remi could not answer.

191. Remi relayed that Plaintiff had fear about losing her job because she had to go to the hospital; Ms. Blood oddly responded by stating that Plaintiff had "emotional problems," and then launched into Plaintiff's write-ups and "costly mistakes."

192. Remi responded that the mistakes she knew of were due to failures by NETA to remedy harassment and its failure provide accommodations for Plaintiff's PTSD.

193. Remi also then reported what Plaintiff had reported several times, that a coworker was harassing her with comments about her appearance, seeking her out, waiting outside the bathroom, and perpetrating other harassing and intimidating behavior.

194. Ms. Blood responded that "no one had reported" that, which Remi told Ms. Blood was untrue as it had been reported multiple times.

195. Ms. Blood then responded "I have a pretty good idea" and that "there was one guy on the environmental service team who had been an issue," seemingly referring to Don.

196. Ms. Blood stated she "would handle it."

197. Plaintiff was out on FMLA from that day on May 6, 2019, until June 24, 2019.

198. While on FMLA Plaintiff was contacted by several coworkers including Steve Finney and Katie Piccinin; later they told Plaintiff that the team leads directed them to contact her and report back.

199. Plaintiff returned to work on June 24, 2019 with a formal list of disability accommodations.

200. The list included things that Plaintiff was asking for prior to her FMLA leave, and included:

    a. Plaintiff be provided with a quiet workspace;

    b. Coworkers be prevented from needlessly touching or distracting Plaintiff;

    c.   Don be prevented from coming near Plaintiff[3];

    d.   Plaintiff should be counseled when mistakes were made, not much later;

    e.   The disability-related comments be removed from her write-ups; and

    f.   Plaintiff be allowed the as-needed use of an icepack and headphones.

201.  Ms. Blood stated it "made sense" Plaintiff did not want to be touched; that was "not a problem."

202.  Ms. Blood stated it would not be a problem to keep Don away as he was "on a final warning[4] and if he approached Plaintiff he would be fired"; the leads were required to enforce this directive.

203.  Ms. Blood also agreed it "sounded fair" and "would look into" revising Plaintiff's write-ups, removing infractions related to her disability, such as for a "negative" attitude.

204.  Ms. Blood also agreed it was "fine" and that she "could not see why that it would not be a possibility" to counsel Plaintiff for errors, instead of Mr. Amoling or Ms. Saster making a list well after the fact and writing her up, while coaching other employees contemporaneously to the error.

205.  Ms. Blood said the quiet workspace would be more "difficult" but said she would "talk to" Mr. Amoling and Ms. Saster to try to find one.

206.  Plaintiff complained to Ms. Blood, again, about differential treatment regarding her writeup; she complained that she had no "notation of conversation" prior to her first write up which was counter to NETA policy, the actual form, and the practice with other employees.

207.  Despite yet another report of differential treatment, Ms. Blood did and said nothing.

208.  Notably, while speaking to Ms. Blood, her phone rang and she proceeded to have an entire conversation in front of Plaintiff about her minor, teenage transgender son's private medical information, transition programs, and the fact that he was suicidal; Plaintiff was uncomfortable.

---

[3] It bears pointing out the obvious, that this is not a disability accommodation; it is something that NETA had a duty to do anyway which would be to remedy reported sexual harassment.

[4] It also bears pointing out that, as discussed *infra*, Don had not even been given a first-level notation of conversation at that time; he was given that first-level warning, which was far from a final warning, two days later.

209. Ms. Blood got off the phone and then tried discussing, with Plaintiff, her son's suicidal nature and her belief it was due to testosterone; she then asked Plaintiff about her own treatment.

210. Plaintiff was extremely uncomfortable discussing her medical experience with Ms. Blood.

211. Plaintiff attempted to end the meeting and Ms. Blood then requested updated FMLA paperwork from the VA and required Plaintiff's doctor fill out a form justifying each accommodation.

212. Plaintiff was given 2 ½ hours to fill out the paperwork, which included dates of diagnoses with PTSD; Plaintiff expressed concern with doing the paperwork without her medical records.

213. Ms. Blood stated to just fill out what she could.

214. When Plaintiff turned in the paperwork less than 3 hours later, when Ms. Blood was leaving that day, the date of disability was left blank by Plaintiff because she was unsure about dates of treatment and the formal diagnosis, but she clearly stated it had been "a while".

215. In response, Ms. Blood told Plaintiff to simply "put the date [she] went into the hospital seeing as that is the date associated with my FMLA and all [her] other paperwork for that situation"; thus, Plaintiff listed "I believe [it] was May 6, 2019," as her date of disability with PTSD, per Ms. Blood's express instruction.

216. Notably, the doctor's form submitted as part of that paperwork clearly indicates that Plaintiff has had PTSD since her time leaving the military in 2013; specifically, her doctor wrote "this has been present since 2013, it is expected to be chronic, she will always need accommodations."

217. Relatedly, soon after that meeting, Plaintiff discussed the quiet workspace with Ms. Saster who said Plaintiff could work in the building across the street or use the vault which were both quiet.

218. Plaintiff informed Ms. Blood of those spaces per Ms. Saster; Plaintiff thought the quite workspace was resolved and was waiting for Ms. Saster to give her the go-ahead to move.

219. Finally, in that meeting with Ms. Blood, Plaintiff *again* reported Don's sexual harassment of her.

23

220. Only after that meeting, on June 26, 2019, was Don given his first warning for the harassment; however, Don's "discipline" was only a first-level corrective action "notation of conversation" for what was blatantly characterized in that notation as "comments about [Plaintiff's] body, hair, etc. [which] violate our Freedom From Harassment policy (pgs 10-12) that states that commenting on an individual's body can be considered sexual harassment."

221. To be clear, Don received a first-level "notation of conversation" for sexually harassing Plaintiff (issued months after repeated reports of the same to managers and HR), while Plaintiff was given a *second-level write-up* for her first ever discipline based on common labeling mistakes.

222. The "notation of conversation" did however warn Don to "not speak to Riley unless it is absolutely necessary to complete his job" and noted that Don had been "counseled several times about appropriate conversations and about distracting employees while they are trying to work."

223. Additionally, Don was not supposed to come in Plaintiff's workspace at all, as enforced by leads.

224. But after this meeting, Don continued to find Plaintiff and harass her including waiting outside the women's locker room when Plaintiff came out, coming into Plaintiff's workspace frequently to do things like empty an already empty garbage and coming to the breakroom when she was there – in front of leads tasked with enforcement, and following Plaintiff around[5]; he continued to do this in front of the leads/supervisors and even managers with no one stopping him despite that guarantee.

225. During that time, Don would also frequently cause loud disruptions near Plaintiff, yell across the room to coworkers standing next to her, or intentionally startle her to trigger her PTSD.

226. Upon information and belief, Don was retaliating against Plaintiff for her reports about him and his "notation of conversation" discipline.

---

[5] Again, on the last serious event at NETA on July 18, 2019, which was captured on videos, some of the videos show that after the incident where Don approached Plaintiff in her work area and cornered her causing Plaintiff to have a panic attack, that 15 seconds later Don follows Plaintiff into the breakroom, then out of the breakroom and down the hallway very close to her, after reaching out to grab her buttocks as she had passed by him.

24

227. Moreover, Ms. Blood began to exhibit more conduct making Plaintiff increasingly uncomfortable.

228. For example, Plaintiff was in the locker room changing and a partially-naked Ms. Blood brought up her transgender son's breast development and how her transgender son had the "biggest breasts out of the family," *stated while her shirt was off*; Ms. Blood then motioned to her own bare chest stating "he definitely did not get them from me," while shirtless.

229. Also during this conversation, Ms. Blood inappropriately shared how she had bought her transgender son his first "binder" for his breasts and asked Plaintiff if there was "stuff like that" for trans women," gesturing to her groin area with her hand.

230. Plaintiff was extremely uncomfortable by Ms. Blood's comments.

231. Then days later in early July of 2019, just outside of work, Ms. Blood announced in front of others that Plaintiff should have "come to her earlier about Don" and "saved us all a bunch of trouble"; she also stated that "Don should have been talked to by his team by then."

232. Plaintiff was mortified that Ms. Blood publicly announced she had reported Don's actions.

233. By mid-July of 2019, Plaintiff had been back at work for over two weeks but she still had no accommodations except she was allowed to wear headphones and have an icepack for stress.

234. Coworkers *continued* to touch Plaintiff without permission, intentionally startle her, interrupt her, misgender her, deadname her, yell "Wooooo," and harass her to smile; also nothing was done about any of Plaintiff's requested accommodations that Ms. Blood was "looking into."

235. With no help from HR, Plaintiff had to start wearing a sticker saying "Please don't sneak up behind me, I have PTSD" to minimize being startled.

236. Prior to doing it, Plaintiff asked her supervisor Ms. Saster if she could try that method and Ms. Saster had agreed that it was "cool," clearly having no issue with it.

237. Notably despite the sign, Plaintiff was still startled by her coworkers, possibly even more, often in front of supervisors/leads.

238. Coworkers, and even leads/supervisors, managers, and *Ms. Blood,* would still wave their hands in Plaintiff's face and touch her despite agreement to use the notebook for non-critical issues.

239. On that July 11, 2019, Plaintiff met with Ms. Saster and Ms. Blood simply to complain that she still did not have her accommodations and to ask for an update.

240. Ms. Blood announced that she had "talked to a lawyer" and she did not "have to" change the write-ups to remove disability-related behavior, because there was "nothing wrong" with the write-ups.

241. Ms. Saster added Mr. Amoling "felt" the write-ups had "nothing to do with" Plaintiff's disability.

242. Ms. Blood and Ms. Saster ignored all other accommodation requests that were supposed to be in the works and Ms. Blood pivoted to criticizing Plaintiff, stating there were "a lot of problems."

243. Then, Ms. Saster turned her computer to show Plaintiff a pre-written list of new wrongs, expressly against one agreed-upon accommodation to counsel Plaintiff at the time like other employees.

244. Plaintiff asked why the issues had not been brought up at the time of the alleged error.

245. Ms. Saster said they were "getting around to it now" and simply read Plaintiff the four issues.

246. One of the issues was on a project Plaintiff had not worked on.

247. Another was due to a change in protocol; Plaintiff made a "mistake" before the change.

248. Plaintiff did not understand the other two items.

249. After Plaintiff challenged the factual basis of the issues that she understood, Ms. Saster said she would "look into it" but then Ms. Blood stated "there was clearly still a problem."

250. Ms. Blood seemed hostile and did not elaborate.

251. Plaintiff complained she was still working in the extremely loud lobby two weeks after returning despite her doctors' requests for accommodation and after agreement to move her.

252. Ms. Blood's only response was to question "how loud it could be after 6 PM?"

253. Plaintiff informed her it was a "madhouse" and that she had a recording; Plaintiff played the loud recording and Ms. Blood changed the subject once she heard Plaintiff recording.

254. Ms. Blood then chastised Plaintiff for the sign Ms. Saster had approved to avoid interruptions; Ms. Blood called it "hostile and disruptive."

255. Plaintiff complained that she had been reporting coworker problems since early 2019, which contributed to Plaintiff's increased PTSD symptoms, her recent suicidal state, and had *very recently* resulted in two-months of unpaid leave and inpatient treatment.

256. Ms. Blood stated rudely that she "could not do anything about [Plaintiff's] concentration" and that "[Plaintiff] would have to figure that out on [her] own."

257. At the end of the meeting, it was again agreed that Plaintiff could work in the vault and Ms. Saster offered to get the required software installed so that could occur; Ms. Saster even offered her credentials to try to get to the software for Plaintiff right away so she could move sooner.

258. Ms. Saster's suggestions did not work and Plaintiff continued to wait for a quiet workspace.

259. The next day, on or about July 12, 2019, Ms. Blood again waived her hands in Plaintiff's face.

260. Then, on July 18, 2019, about three weeks since Don was given instructions to stay away from Plaintiff, Plaintiff was working in the lobby area when Don came in vacuuming the area.

261. Again, it was leads and supervisors who were supposed to enforce Don staying away from Plaintiff, however, as Don approached her, lead Mike Viollette was present who allowed Don to engage him in conversation only feet from Plaintiff, without enforcing the rule.

262. Plaintiff watched Don see her, reach into his pocket and take out a paperclip, intentionally drop it on the floor under the desk adjacent to her, then intentionally vacuum it up causing issues with the vacuum that he then used as an excuse to plant himself near Plaintiff to "fix" it.

263. Don talked to Plaintiff's coworkers while slowly moving toward Plaintiff, making it hard for her to exit without coming closer to him; Don then positioned himself in the path of Plaintiff's exit.

264. Plaintiff had a panic attack and went straight to the locker room to calm down.

265. In video provided by NETA, Don is seen following Plaintiff into the breakroom right as she leaves the work area, waiting for her, then as Plaintiff leaves, Don is seen trying tried to touch her back-end, and then Don continues following Plaintiff down the hallway[6].

266.  Plaintiff then went to HR, on video, and is seen having to hold herself up as she walks and visibly shaking due to her panic attack while waiting in HR[7].

267. Once at HR, Plaintiff told Ms. Joyce that she was having a panic attack, and Ms. Joyce responded that it was "very evident"; Plaintiff was sent home.

268. A few days later on July 22, 2019, Plaintiff returned to work and was quickly approached by Ms. Blood who took her to her office and asked her about what happened with Don.

269. Plaintiff told her what had happened and Ms. Blood stated she would look into it; in that meeting Ms. Blood also stated that she had talked to Ms. Saster and was "going to push for [Plaintiff] to move to the vault which should have been the plan from the beginning"; it still did not happen.

270. Over the next few work days, Don *continued* to seek Plaintiff out and otherwise make her very uncomfortable; Don was not written up for these incidents.

271. Also after Plaintiff's second brief leave from work, her coworkers continued harassing her by misgendering and deadnaming her, yelling in her ear, touching her, waiving their hands in her face, startling her intentionally, and saying "smile."

272. As a result, Plaintiff had more panic attacks at work.

---

[6] NETA provided videos they claimed would disprove Plaintiff's claims about Don; instead first, they provided extremely poor-quality video – which Plaintiff knows to be true as she used to work with these videos in security. Second, the video supposedly covering the main events of Don dropping the paperclip and vacuuming it up while positioning himself to block Plaintiff's exist, was sent in a different, non-video file-type, that was unplayable; worse, when installed, it indicated an error and likely spyware. Thus, the video with the key events would not play, however, the other videos provided, did play and *demonstrated Don following Plaintiff* to the break room *exactly 15 seconds after Plaintiff leaves her work area* after the main events. Those videos also show Don stop in the doorway of the breakroom, directly adjacent to Plaintiff's exit, pretending to fiddle with the vacuum placed on the food counter. Then as Plaintiff goes to leave the breakroom, Don abandons the vacuum, turns toward Plaintiff's back, and reaches out for her buttocks. Then, Don follows Plaintiff out of the breakroom at a close distance and as Plaintiff moves toward HR she is then seen having to hold herself up and shaking while having a panic attack.

[7] See fn. 1 *supra*.

273. Also, Plaintiff *still* did not have a quiet workspace as agreed a month prior, still did not have a way for coworkers to not interrupt her as agreed, still did not have a way to not be touched as agreed, still had not been coached on mistakes as agreed, and Don was still harassing her.

274. Plaintiff felt increasingly upset and unsafe at work and then on July 29, 2019, Plaintiff expressed to her partner Remi that she was feeling suicidal again; Plaintiff told Remi that she felt that going back to NETA was "pushing [her] over the edge" and was making her feel as unstable as in May.

275. Plaintiff's doctors recommended leave until all of her accommodations had been not just agreed to but implemented and the situation with Don had been permanently resolved.

276. As such, Plaintiff took the remainder of her FMLA leave and requested, via email, on or about August 8, 2019, that her job be held for her, as is required by the FMLA, as an ADA accommodation, past the expiration of her FMLA leave if matters had not yet been resolved; in other words, Plaintiff requested an ADA accommodation to extend FMLA job protection ensuring a substantially similar job would be held for her until NETA implemented the very reasonable accommodations requested *by her doctor*.

277. NETA granted the accommodation to extend FMLA job protection but again, did not enforce it.

278. The other accommodations requested were the same as those discussed months prior, supported by her doctor's written request, and included that:

   a. Plaintiff be provided with a quiet workspace[8];

   b. Coworkers be prevented from needlessly touching or distracting Plaintiff;

   c. Don would be prevented from coming near Plaintiff;

   d. Plaintiff be counseled when she made mistakes, not provided a list much later;

---

[8] Plaintiff had been complaining about needing a quite workspace since before January 17, 2019 in an email to Adam Freed where she pointed out that she had raised this to Wes and Ava already; moreover, Adam Freed's and Amina Adhami's emails in response confirm, by their content, the noise and distraction in the area Plaintiff worked which posed a problem for the work of employees even without PTSD. Notably, leader Adam Freed yelled at Plaintiff for raising this issue in email in January.

    e.   The disability-related comments be removed from Plaintiff's write-ups; and

    f.   Plaintiff would be allowed the as-needed use of an icepack and headphones[9].

279.  Remi and Plaintiff communicated with Ms. Blood for the entirety of her remaining FMLA leave and beyond, from July 29, 2019 through her September 27, 2019 constructive discharge.

280.  Ms. Blood never provided a straight answer on Plaintiff's doctor-requested accommodations; in other words, not only did she not implement these accommodations, she did not agree to them despite most having already been agreed to verbally in June of 2019.

281.  In fact, for over a month, Plaintiff and Remi wrote about 13 emails (22 pages) asking for clarification on what accommodations NETA would commit to.

282.  In response, Ms. Blood wrote about 14 emails (15 pages) yet never approved the doctor-requested accommodation, and at times, expressly revoked accommodations previously agreed to.

283.  Plaintiff had been planning to return to work at the end of August of 2019, however as that date neared, Plaintiff still had no approved accommodations.

284.  Additionally, NETA put up barriers to Plaintiff getting her accommodations worked out.

285.  For example, NETA required that Remi sign an authorization form, which had never been required before allowing her to speak for Riley at times that Riley needed that help.

286.  Then, nearly a month after Remi had promptly returned the authorization form, specifically on August 26, 2019, Remi emailed Ms. Blood to reminder her that she had long-since sent the authorization "weeks ago and have not heard anything."

287.  In that email, Remi requested information about Plaintiff's quiet workspaces, her move to either the vault or across the street, as well as requested updates on how NETA would prevent coworkers from touching and surprising Plaintiff upon her return, as NETA had previously failed at this.

---

[9] This was the only accommodation both agreed to and implemented.

288. However, on August 28, 2019, instead of updating Remi on the accommodations, Ms. Blood stated that Plaintiff's job was no longer available; but was offered a "new" job that was not substantially similar to her old job, as required by FMLA, due to a significant start and end time change.

289. The job hours for this "new job" changed from Plaintiff's normal shift of 2:30 PM to 11:00 PM to start and end times of 5:30 PM and 2:00 AM.

290. Not only was this a significant change in work hours, it interfered with her medication schedule.

291. Moreover, the location of the "new job" was a notably *louder* location than before.

292. As such, on August 29, 2019, Plaintiff requested an additional accommodation; she requested to work in her "new" job the normal shift times; Plaintiff stated that her job had not been held and instead had been "drastically changed."

293. Moreover, Ms. Blood was informed that the new shift would "interfere with [her] medications schedule and would be difficult for [her] due to [her] disability"; thus she requested a reasonable accommodation of shift hours from 2:30 to 11:00 P.M. and if that was not possible, she requested that she "be given one of the 1st/day shift positions" which had been given to others in the past outside of seniority or other work-related bases.

294. On August 30, 2019, Ms. Blood responded that all prior accommodations were "no longer available due to the restructuring of the department."

295. Further Ms. Blood summarily denied Plaintiff moving to the 1st shift because "we have a full morning roster" but stated she would "see if it is possible" to change Plaintiff's shift hours; this request was never granted even after *a month of emails*.

296. Plaintiff notified Ms. Blood that she could not return, per her treatment providers', until she had an agreement on accommodations because "last time [Plaintiff] returned to work under the impression that [they] would work on the solutions [] absolutely nothing was worked on or solved."

297. Despite Plaintiff and Remi's 13 emails (22 pages) and Ms. Blood's 14 emails (15 pages), Ms. Blood never agreed to any accommodations after they were rescinded "due to the restructuring."

298. For example, on August 29, 2019, Plaintiff reminded Ms. Blood that her doctor faxed the documentation demonstrating the need for accommodations including a quiet workspace on August 8, 2019 and yet nothing was agreed by NETA.

299. On August 30, 2019, Ms. Blood responded trying to convince Plaintiff that the new workspace – the lab/kitchen – was "much quieter and less hectic"; other options could be "discuss[ed]" later.

300. On September 5, 2019, Plaintiff complained that the vault or across the street had been "approved since the end of June and [she] was only waiting on a timeline" which was "rescinded now."

301. Plaintiff further complained that the lab/kitchen was not "much quieter and less hectic"; she relayed that there were more employees in that area, that the lab/kitchen was an "enclosed space that amplifies sound," that employees play music on the speakers there, and that it was "tight" quarters where she would be touched more against her doctor's requested accommodation.

302. Similarly, on September 8, 2019, Plaintiff complained that workspace agreements were rescinded.

303. On September 11, 2019, Ms. Blood responded and denied "rescinding" Plaintiff's accommodations to work in the vault or across the street; according to her, since Plaintiff's job had been changed[10] and the "new role requires [her] to be accessible to multiple people," Plaintiff could no longer be accommodated with the quiet workspaces despite her doctor's request.

304. Importantly, Ms. Blood claim that Plaintiff's new job was different was false; a side-by-side comparison of the old and new job descriptions shows they were nearly identical.[11]

---

[10] The only substantive "change" to Plaintiff's job that she could determine was that it started 3 hours later and was located in a more-noisy/closed-in location. The job duties were nearly the same and the position description identical.

[11] Plaintiff's old job states the position "is responsible and accountable for coordination and quality control of all Marijuana Infused Products (MIPs) inventory" and the "new" job is identical, stating it is responsible and accountable for coordination and quality control of all Marijuana Infused Products (MIPs) inventory." In all other material ways they are identical.

305. On September 11, 2019, Ms. Blood stated that NETA had "in fact addressed many of [Plaintiff's] requests, even though [she] had not been shown medical documentation" which was untrue because Plaintiff's doctor faxed the form more than a month prior on August 8, 2019[12].

306. Further, Ms. Blood stated that Plaintiff's requested accommodation of a quiet workspace had been "addressed" by the future promise of "attempting to find a quiet workspace."

307. A future promise to "attempt" or "discuss" something is not a reasonable accommodation.

308. On September 17, 2019, Plaintiff pointed out that Ms. Blood had not responded to her concerns about workspace in the lab/kitchen, suggested she could work in the vault or across the street and use a walky-talky or internal phone system, and raised concerns about relying on a future promise of a quite workspace since this had proved unreliable the  last time she returned from FMLA.

309. On September 20, 2019, Ms. Blood failed to substantively address any of Plaintiff's concerns, simply repeating the list of "accommodations" and vague future promises, then concluded that "we need a note from your provider that supports these requests" despite already having the proof of need for these accommodations from her doctor returned to NETA on August 8, 2019.

310. Ms. Blood handled Plaintiff's request to not be needlessly touched, distracted, or startled by coworkers no better; Ms. Blood's August 30, 2019 email vaguely promised that "we reinforced with the team, through the team leaders and supervisors, the need to not startle or surprise you and are happy to continue to do so."

311. Ms. Blood however also admitted this same email that such reinforcement had failed the first time; she admitted in that email that "on several occasions your co-workers poked you in jest."

---

[12] The "medical documentation" of Plaintiff's requested accommodations, which is not required under the law, became an additional hurdle; after her doctor faxed the formal request to NETA on August 8, 2019, NETA then changed Plaintiff's job and requested an *updated form* even though there were no substantive changes to the job.

312. On September 8, 2019, Plaintiff complained that "often with [Plaintiff's] team leads witness[ed] it" as coworkers were touching her.

313. Ms. Blood responded only that the "[e]xpectation of never being 'touched' at work is not realistic…" and "nor is all touching in the workplace inappropriate or surprising."

314. Ms. Blood's statement was in direct contradiction to previous statements that not being touched was "completely reasonable," it was "standard in the workplace," and there "is no reason anyone at NETA should be touching anyone else because it is not part of any's job duties."

315. Ms. Blood's emails promised only future efforts that had already failed, such as "[i]nstructions not to touch [Plaintiff]," rather than any actual accommodation

316. In her constructive termination email on September 27, 2019, Plaintiff explained she could not trust future promises in lieu of accommodations: "When I returned 6/24/19 [] I was promised I wouldn't be touched, snuck up on, interruptions would be limited and streamlined, that I would be moved to a quieter workspace" but that no promise was followed through on.

317. Ms. Blood handled Don's harassment even worse; on August 30, 2019, Ms. Blood's email not only denied that Plaintiff had ever reported harassment, but she justified Don's behavior.

318. Specifically, Ms. Blood stated that the event with Don and the vacuum on July 18, 2019, as not "in any way [] sexual, or even somehow inappropriate"; Plaintiff had not claimed it was sexual.

319. Further, Ms. Blood shockingly admitted in email that "Don may have made some statements that may not have been entirely appropriate," but that he "may have made some this [sic] comments due to his lack of self-awareness, which is pretty obvious ...." and that his comments should be excused due to his "obvious" "lack of self-awareness."

320. Notably, Ms. Blood had stated, in May, that Don's conduct was inappropriate and was "dealt with"; this was repeated on June 24, 2019.

321. On September 5, 2019, Plaintiff reminded Ms. Blood that she had been reporting Don's sexual harassment since it started and nothing effective had been done to stop him.

322. On September 11, 2019, Ms. Blood stated NETA agreed to provide "instructions to Don to not talk to [Plaintiff] on any non-work-related matters" which was already in place *prior* to the day with the vacuum incident occurred and Don followed Plaintiff around NETA on video.

323. Ms. Blood then concluded, despite the notation of conversation calling Don's earlier acts towards Plaintiff sexual harassment in violation of policy, that while Don's comments were "perhaps 'less than appropriate'" they were "far from sufficiently severe or pervasive to be sexual harassment."

324. Further, Ms. Blood justified these statements and Don's "lack of awareness" as her "trying to convey that he lacks self-awareness that might have avoided the issues if he were more self-aware," rather than provide solutions for Don's inappropriate conduct towards Plaintiff.

325. Ms. Blood, while discussing Plaintiff's return to work, again mischaracterized Don's final intimidating event with the vacuum as benign because in "order for behavior to constitute sexual harassment, it needs to have some sexual overtone to it and vacuuming the floor plainly was not."

326. To be clear, Plaintiff never claimed that event was sexual harassment – she claimed it was intimidation in retaliation for Plaintiff's complaints about Don and Don's notation of conversation.

327. On September 20, 2019, Ms. Blood represented that NETA would only agree to "[i]nstructions to Don to not talk to [Plaintiff] on any non-work-related matters" and left open if Don could still enter Plaintiff's work area, follow her, and wait for her outside of the bathroom.

328. In her constructive discharge email on September 27, 2019, Plaintiff responded that allowing Don to be near her was unreasonable because Don had "exhibited an intentional desire to harass [her] and now intimidate [her]" after Plaintiff had reported him and he was written up.

329. Due to the aforesaid reasons, on that day, September 27, 2019, Plaintiff was constructively discharged due NETA's utter inability to provide any accommodations required by her doctor and express (in email) refusal to remedy reported and documented sexual harassment and retaliation.

330. Plaintiff was also denied her FMLA right to a substantially similar job after leave and NETA failed to accommodate Plaintiff's by allowing her to go back to her old shift or work the 1st shift.

331. In that vein, NETA discharged Plaintiff by not retaining a substantially similar job for Plaintiff.[13]

332. As a direct and proximate result of NETA's harassing, discriminatory, and retaliatory actions and omissions, which are in violation of federal and state law, Plaintiff suffered loss of income, loss of earning potential, and loss of a variety of work-related benefits; she experienced humiliation and loss of standing in the community; she suffered and continues to suffer from extreme emotional distress and mental anguish resulting in physical injury; she suffered the extreme medical expenses due directly and proximately from the harassment, discrimination, and retaliation at NETA; she suffered months of missed work without pay due to unpaid leave for the same reason; and suffered other injuries.  All damages continue to date.

## COUNT ONE
### DISABILITY – *DISCRIMINATORY TERMS AND CONDITIONS*
### *DISABILITY - DISCRIMINATORY TERMINATION*
### *DISABILITY - DISCRIMINATORY FAILURE TO ACCOMMODATE*
***Violation of Americans With Disabilities Act 42 U.S.C. § 12112 (ADA), Violation of Mass. Gen. L. ch. 151B et. seq***

333. ALL Paragraphs are hereby incorporated by reference in their entirety as if fully stated herein.

334. Plaintiff is a qualified person with a disability.

335. Plaintiff's PTSD and associated manifestations including anxiety and depression, qualify as a disability under ADA and 151B.

---

[13] A job in a more-noisy location that required starting work three hours later – at dinner time – and continuing through the middle of the night is not substantially similar to a job with an afternoon starting shift that ended at Plaintiff's bedtime.

336. These mental conditions substantially impairs one or more major life function including but not exclusive to memory, concentration, and coping with stress.

337. Regardless, at all times relevant, Plaintiff was able to perform the necessary job functions with or without accommodation.

338. Therefore, Plaintiff was protected from harassment, discrimination and termination because of disability under the ADA and 151B.

339. Plaintiff was subjected to harassment and discrimination by Defendant's agents because of her disability based on the aforesaid conduct.

340. Specifically, the aforesaid conduct demonstrates that Plaintiff was subjected to discrimination by Defendant's agents when they repeatedly failed to reasonably accommodate her disability.

341. Plaintiff was subjected to a harassment through a hostile work environment that changed the terms and conditions of employment due to disability-based harassment and disparate treatment.

342. Plaintiff's manager and supervisor, as well as HR, also subject her to disparate treatment not bestowed upon similarly-situated non-disabled coworkers.

343. Defendant knew of this hostile work environment and the unlawful disparate treatment discrimination due to Plaintiff's reports to supervisors, managers, NETA leadership including Mr. Ovelman and HR.

344. Despite knowledge, Defendant's agents all failed to remedy the harassment and discrimination.

345. But for Defendant's agents' discriminatory conduct, Plaintiff would not have been constructively terminated; no reasonable person in Plaintiff's circumstances could have remained in that environment without remedy from harassment, retaliation, and without doctor-required reasonable accommodations.

346. But for Defendant's agents' discriminatory conduct, Plaintiff would not have been terminated by Defendant failing to maintain a substantially similar job as required by the ADA accommodation extending FMLA.

347. Defendant's agents' discriminatory conduct, policies, and practices were intentionally discriminatory, motivated by animus, impermissible and unlawful considerations, which violate, *inter alia*, ADA and 151B.

348. Plaintiff experienced the damages aforesaid as a proximate result of Defendant's agents' intentional conduct.

349. Because Defendant's conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

350. Defendant is vicariously responsible for the acts and omissions of its agents under Respondeat Superior.

### COUNT TWO
*DISABILITY RETALIATION –RETALIATORY TERMS AND CONDITIONS*
*DISABILITY RETALIATION –RETALIATORY TERMINATION*
**Violation of Americans With Disabilities Act 42 U.S.C. § 12203 (ADA), Violation of Mass. Gen. L. ch. 151B et. seq**

351.  ALL Paragraphs are hereby incorporated by reference in their entirety as if fully stated herein.

352. Plaintiff was protected from retaliation for reporting disability-based harassment and discrimination under ADA and 151B.

353. Plaintiff engaged in protected conduct, opposed unlawful conduct, and exercised her rights under ADA and 151B, by reporting harassment and discriminatory treatment because of a protected class to supervisors, managers, and HR for the Defendant.

354. As a result of Plaintiff's protected activity, Plaintiff was subjected to disparate treatment and harassment which changed the terms and conditions of her employment in the ways stated above.

355. Defendant's agents knew of the retaliatory conduct but failed to take swift, remedial action to remedy it in violation of, *inter alia*, ADA and 151B.

356. But for Defendant's agents' retaliatory conduct, Plaintiff would not have been constructively terminated; no reasonable person in Plaintiff's circumstances could have remained in that environment without remedy from harassment, retaliation, and without doctor-required reasonable accommodations.

357. But for Defendant's agents' retaliatory conduct, Plaintiff would not have been terminated by Defendant failing to maintain a substantially similar job as required by the ADA accommodation extending FMLA.

358. Defendant's agents' retaliatory conduct, policies, and practices were intentionally retaliatory, motivated by animus, impermissible and unlawful considerations, which violate, *inter alia*, ADA and 151B.

359. Plaintiff experienced the damages aforesaid as a proximate result of Defendant's agents' intentional conduct.

360. Because Defendant's conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

361. Defendant is vicariously responsible for the acts and omissions of its agents under Respondeat Superior.

### COUNT THREE
GENDER IDENTITY –*DISCRIMINATORY TERMS AND CONDITIONS*
GENDER IDENTITY – *DISCRIMINATORY TERMINATION*
***Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 and Violation of 151B***
***(151B)***

362. Plaintiff incorporates by reference ALL paragraphs above as if fully set forth herein.

363. Plaintiff is afforded protections from discrimination and harassment on the basis of gender-identity under Title VII and 151B.

364. Defendant's agent subjected Plaintiff to harassment and disparate treatment because of gender-identity which changed the terms and conditions of her employment in the ways stated above.

365. Defendant's agent knew of the harassment and disparate treatment, but failed to take swift, remedial action to remedy it in violation of, *inter alia*, Title VII and 151B.

366. But for Defendant's agents' discriminatory conduct, Plaintiff would not have been constructively terminated; no reasonable person in Plaintiff's circumstances could have remained in that environment without remedy from harassment, retaliation, and without doctor-required reasonable accommodations.

367. But for Defendant's agents' discriminatory conduct, Plaintiff would not have been terminated by Defendant failing to maintain a substantially similar job as required by the ADA accommodation extending FMLA.

368. Defendant's agents' discriminatory conduct, policies, and practices were intentionally discriminatory, motivated by animus, impermissible and unlawful considerations, which violate, *inter alia*, Title VII and 151B.

369. Plaintiff experienced the damages aforesaid as a proximate result of Defendant's agents' intentional conduct.

370. Because Defendant's conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

371. Defendant is vicariously responsible for the acts and omissions of its agents under Respondeat Superior.

**COUNT FOUR**
*SEX - HOSTILE WORK ENVIRONMENT / DISCRIMINATORY TERMS AND CONDITIONS*
***Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 and Violation of 151B***
***(151B)***

372. Plaintiff incorporates by reference ALL paragraphs above as if fully set forth herein.

373. Plaintiff is afforded protections from discrimination and harassment on the basis of sex or gender under Title VII and 151B.

374. Defendant's agent subjected Plaintiff to harassment and disparate treatment because of sex which changed the terms and conditions of her employment in the ways stated above.

375. Defendant's agent knew of the harassment and disparate treatment, but failed to take swift, remedial action to remedy it in violation of, *inter alia*, Title VII and 151B.

376. But for Defendant's agents' discriminatory conduct, Plaintiff would not have been constructively terminated; no reasonable person in Plaintiff's circumstances could have remained in that environment without remedy from harassment, retaliation, and without doctor-required reasonable accommodations.

377. But for Defendant's agents' discriminatory conduct, Plaintiff would not have been terminated by Defendant failing to maintain a substantially similar job as required by the ADA accommodation extending FMLA.

378. Defendant's agents' discriminatory conduct, policies, and practices were intentionally discriminatory, motivated by animus, impermissible and unlawful considerations, which violate, *inter alia*, Title VII and 151B.

379. Plaintiff experienced the damages aforesaid as a proximate result of Defendant's agents' intentional conduct.

380. Because Defendant's conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

381. Defendant is vicariously responsible for the acts and omissions of its agents under Respondeat Superior.

**COUNT FIVE**
GENDER IDENTITY/ SEX RETALIATION –*RETALIATORY TERMS AND CONDITIONS*
GENDER IDENTITY/SEX RETALIATION – *RETALIATORY DISCHARGE*

### *Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3 and Violation of 151B (151B)*

382.  Plaintiff incorporates by reference ALL paragraphs above as if fully set forth herein.

383.  Plaintiff was protected from retaliatory harassment, discrimination, and termination as a result of engaging in protected conduct under Title VII and 151B.

384.  Plaintiff engaged in protected conduct, opposed unlawful conduct, and exercised her rights under the Title VII and 151B, by reporting harassing and discriminatory treatment because of a protected class to supervisors, managers, and HR for the Defendant.

385.  As a result of Plaintiff's protected activity, Plaintiff was subjected to disparate treatment which changed the terms and conditions of her employment in the ways stated above.

386.  Defendant's agents knew of the retaliatory conduct but failed to take swift, remedial action to remedy it in violation of, *inter alia*, Title VII and 151B.

387.  But for Defendant's agents' retaliatory conduct, Plaintiff would not have been constructively terminated; no reasonable person in Plaintiff's circumstances could have remained in that environment without remedy from harassment, retaliation, and without doctor-required reasonable accommodations.

388.  But for Defendant's agents' retaliatory conduct, Plaintiff would not have been terminated by Defendant failing to maintain a substantially similar job as required by the ADA accommodation extending FMLA.

389.  Defendant's agents' retaliatory conduct, policies, and practices were intentionally retaliatory, motivated by animus, impermissible and unlawful considerations, which violate, *inter alia*, Title VII and 151B.

390.  Plaintiff experienced the damages aforesaid as a proximate result of Defendant's agents' intentional conduct.

391. Because Defendant's conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

392. Defendant is vicariously responsible for the acts and omissions of its agents under Respondeat Superior.

## COUNT SIX
### *FMLA INTERFERENCE WITH EXERCISE OF RIGHTS*
### *FMLA RETALIATION*
### *Violation of Family and Medical Leave Act 29 U.S.C. § 2615 (FMLA)*

393.  ALL Paragraphs are hereby incorporated by reference in their entirety as if fully stated herein.

394. Plaintiff was eligible for FMLA; she worked for NETA for more than twelve (12) months and was employed for at least 1,250 hours preceding the desired leave in or about late July 2019.

395.  Defendant was a covered entity and employer, as defined by FMLA through Plaintiff's termination in October 2019.

396.  Plaintiff had a qualifying medical condition as of May 2019.

397.  As alleged above, Plaintiff was protected from interference with her rights under FMLA, as well as protected from retaliation under the FMLA for exercising her rights.

398.   Plaintiff was retaliated against for taking FMLA, as described above, violating *inter alia*, the FMLA.

399. Defendant interfered with Plaintiff's FMLA rights, violating *inter alia*, the FMLA in the ways stated above.

400. But for Defendant's agents' interference and retaliatory conduct, Plaintiff would not have been constructively terminated; no reasonable person in Plaintiff's circumstances could have remained in that environment without remedy from harassment, retaliation, and without doctor-required reasonable accommodations.

401. But for Defendant's agents' interference and retaliatory conduct, Plaintiff would not have been terminated by Defendant failing to maintain a substantially similar job as required by the ADA accommodation extending FMLA.

402. Defendant's agents' retaliatory conduct, policies, and practices were intentionally retaliatory, motivated by animus, impermissible and unlawful considerations, which violate, *inter alia*, FMLA.

403. Plaintiff experienced the damages aforesaid as a proximate result of Defendant's agents' intentional conduct.

404. Because Defendant's conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

405. Defendant is vicariously responsible for the acts and omissions of its agents under Respondeat Superior.

**COUNT SEVEN**
*COMMON LAW INVASION OF PRIVACY*

406. ALL Paragraphs are hereby incorporated by reference in their entirety as if fully stated herein.

407. Massachusetts recognizes a legal claim for publication of private facts based on Mass. Gen. Laws ch. 214, § 1B, which proscribes "unreasonable, substantial or serious interference" with one's privacy.

408. After agreement to not do so, NETA and its agents published Plaintiff's personal and private information related to her gender change and medical information to managers, who in turn were directed by NETA to share it with all employees, without the authorization of Plaintiff.

409. The information published was of a highly personal or intimate nature and was of no business of the public, thereby making the publication offensive to a reasonable person.

410. The information published was not newsworthy.

411. Plaintiff did not consent to the publication of her gender change without her presence and involvement in such a disclosure contrary to how it was done.

412. Plaintiff did not consent to the publication of her personal medical information, such as that she was on hormone replacement therapy, under any condition or circumstance.

413. The publication was made to more than one or two persons; it was made to the entire company.

414. Plaintiff was damaged as a proximate result of Defendant's and its agents' intentional conduct in that she was humiliated and experienced extreme emotional distress resulting in physical injury.

415. Defendant is responsible for its agents' acts and omissions under the theory of *respondeat superior.*

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court:

a.   Order judgment for Plaintiff against Defendant on all Counts of the Complaint and declare that the practices detailed in this Complaint are unlawful;

b.   Order, for all applicable Counts, that Defendant make Plaintiff whole by awarding appropriate back pay with interest, front pay, compensation for all other lost income and benefits, earning capacity, and all other relevant entitlements and emoluments;

c.   Order, for all applicable Counts, that Plaintiff be awarded an amount of money which will fairly compensate her for her mental anguish, emotional pain and suffering, damage to her reputation, loss of standing in the community, and other damages incurred;

d.   Order, for all applicable Counts, that Plaintiff be awarded an amount of money which will fairly compensate her for her medical costs and related damages incurred;

e.   Order, for all applicable Counts, that the Defendant pay Plaintiff's costs and reasonable attorney's fees resulting from this action;

f.  Order, for all applicable Counts, that the Defendant pay punitive or exemplary damages, as appropriate to punish Defendant for its malicious conduct, reckless conduct, and/or callous indifference to the statutorily and common law protected rights of Plaintiff;

g.  Order, for all applicable Counts, that Defendant pay pre-judgement, including interest for all damages awarded to Plaintiff from the date the cause of action accrued, and post-judgment interest where appropriate and allowable by law;

h.  Retain jurisdiction of this action to ensure full compliance; and

i.  Order, for all Counts, such other relief to Plaintiff as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

### ***PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE***

July 29, 2020

Respectfully Submitted by Plaintiff,
RILEY SOULE
By her attorney,

 _/s/ Paige Munro-Delotto__
Paige Munro-Delotto, Ph.D., Esq.
BBO# 690605
Munro-Delotto Law, LLC
400 Westminster Street, Suite 200
Providence, RI 02903
(401) 521-4529
(866) 593-9755 (fax)
Email: Paige@pmdlawoffices.com