# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RILEY SOULE,<br><br>               Plaintiff,<br><br>v.<br><br>NEW ENGLAND TREATMENT ACCESS, LLC and NEW ENGLAND TREATMENT ACCESS, INC.,<br><br>               Defendant. | CA NO. : 1:20-CV-11436-DJC<br><br>JURY TRIAL DEMANDED |

## DEFENDANT'S ANSWER TO PLAINTIFF'S AMENDED COMPLAINT

Defendant, New England Treatment Access LLC[1] files its Answer to the Amended Complaint of Plaintiff Riley Soule. Defendant denies any factual allegations and legal conclusions in the Amended Complaint not otherwise specifically admitted herein. In response to the numbered paragraphs in the Amended Complaint, Defendant states as follows:

## PARTIES

1.    Plaintiff presently resides in the city of North Providence, county of Providence, within the State of Rhode Island and formerly worked for Defendant at its Massachusetts location.

**ANSWER:** Defendant lacks knowledge as to Plaintiff's residence. Defendant admits that Plaintiff formerly worked for Defendant at its Franklin, Massachusetts location.

2.    NETA, LLC is, upon information and belief, was a foreign domestic non-profit corporation doing business in the State of Massachusetts with a principal place of business located in the city of Franklin, county of Norfolk, within the Commonwealth of Massachusetts, formed in 2013;

---

[1] Plaintiff improperly named New England Treatment Access, Inc. New England Treatment Access, LLC is the entity that employed Plaintiff.

however, in 2018, the non-profit, upon information and belief was converted into one or both of New England Treatment Access Inc., a domestic for-profit corporation, and New England Treatment Access, LLC, a domestic LLC, both doing business in the state of Massachusetts at the same address as the original non-profit NETA.

**ANSWER:** Denied.

3.      Defendant, herein, is the collective of all present NETA entities.

 **ANSWER:** Denied.

## <u>JURISDICTION AND VENUE</u>

4.      This Court has jurisdiction to hear the Amended Complaint pursuant to 28 U.S.C. § 1331.

**ANSWER:** This paragraph contains legal conclusions to which no answer is required.

5.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367. Plaintiff's state claims are so related to Plaintiff's federal claims that they form part of the same case or controversy. Consideration of judicial economy, fairness, and convenience warrants this Court's exercise of supplemental jurisdiction over Plaintiff's state law claims.

**ANSWER:** This paragraph contains legal conclusions to which no answer is required.

6.      Venue of this action lies pursuant to 28 U.S.C. § 1391(b) because Defendant conducts business in Massachusetts within the judicial district of this Court, as well as because the alleged unlawful practices occurred and/or continue to occur within the state of Massachusetts within the judicial district of this Court.

**ANSWER:** This paragraph contains legal conclusions to which no answer is required.

## ADMINISTRATIVE PROCEDURES

7.      On or about November 18, 2019, Charges of Discrimination were timely filed with the Massachusetts Commission Against Discrimination (MCAD) and co-filed with the Equal Employment Opportunity Commission (EEOC).

**ANSWER:** Denied.

8.      On or about May 12, 2020, MCAD issued its withdrawal of jurisdiction (MCAD N0.20-BEM-00137; EEOC NO. 16C-2020-00733) with the EEOC Notice of Right to Sue issued subsequently, enabling this private civil action to be filed.

**ANSWER:** Admitted.

9.      This Amended Complaint was timely filed after issuance of the withdrawal and Right to Sue.

**ANSWER:** This paragraph contains legal conclusions to which no answer is required.

## FACTUAL ALLEGATIONS

10.     Plaintiff is a transgender female who is a US Army combat veteran from the 1-505[th] Parachute Infantry Regiment 3rd Brigade Combat Team, 82nd Airborne Division.

**ANSWER:** Defendant lack information about details related to Plaintiff's military service. Defendant admits that on information and belief plaintiff identifies as a transgender female.

11.     During Plaintiff's military service she experienced both sexual assault and combat trauma, which resulted in Post-Traumatic Stress Disorder (PTSD) by 2013 when she left service; Plaintiff has also suffered at least 10 traumatic brain injuries, a contributing factor to her PTSD.

**ANSWER:** Defendant is without sufficient knowledge or information to admit or deny the allegations in this paragraph.

12.     Plaintiff's has been treated for PTSD since the time she left service; in October 18, 2018, the military recognized that Plaintiff was 50% disabled due to PTSD.

**ANSWER:** Defendant is without sufficient knowledge or information to admit or deny the allegations in this paragraph.

13.     With her diagnoses of PTSD, as well as the related conditions of anxiety and depression, Plaintiff is a person with a disability because she has a mental impairment that substantially limits one or more major life functions such as concentration, memory, and coping with stress.

**ANSWER:** This paragraph contains legal conclusions to which no answer is required. Further, Defendant is without sufficient knowledge or information to admit or deny the allegations in this paragraph.

14.     Because of Plaintiff's disabilities, she experiences severe panic attacks, generally stemming from being touched or startled, which affects her ability to cope with certain stressful situations; additionally, Plaintiff has related difficulty with loud noise sensitivity.

**ANSWER:** Defendant lacks information sufficient to admit or deny the allegations in this paragraph.

15.     However, when working conditions are reasonably non-distracting and quiet, her concentration is not a problem and she has been complemented by NETA for her attention to detail.

**ANSWER:** Denied.

16.     NETA coworkers, supervisors, managers and HR all knew Plaintiff had mental at all times relevant because she was treated for PTSD (and related depression/anxiety) actively while at NETA and Plaintiff has shared the same with her manager/supervisors openly.

**ANSWER:** Denied.

17.     Plaintiff was hired onto the security team at NETA in April 2017 by manager Steve Coraccio.

**ANSWER:** Defendant admits that NETA hired Plaintiff into a position on its security team in April 2017 and her manager was Steve Coraccio, but otherwise denies the remaining allegations contained in this paragraph

18.     At all times relevant, Plaintiff met or exceeded NETA's reasonable expectations.

**ANSWER:** Denied.

19.     Plaintiff worked on the security team from April 2017 to November 2018; in November 2018, Plaintiff was granted a new job in inventory as an Inventory Specialist.

**ANSWER:** Admitted.

20.     Plaintiff was commended for her work by Mr. Coraccio (security manager/supervisor), Dave Ovalman (head of production) ("Mr. Ovalman"), and Chris Samuel (security team lead) ("Mr. Samuel") weekly when she was working in security.

**ANSWER:** Denied.

21.     Similarly, as an Inventory Specialist, Plaintiff was complemented for her work by her manager Wes Amoling ("Mr. Amoling") and her supervisor Ava Saster ("Ms. Saster"), such as them stating to Plaintiff "good catch" and "good job," and she was commended for going above and beyond with cleaning and on her project work.

**ANSWER:** Defendant admits that, on occasion, Ms. Saster and Mr. Amoling complimented Ms. Soule and other employees for catching mistakes (which was part of Ms. Soule's job as an Inventory Specialist) or for otherwise completing her required tasks. Defendant is without

knowledge as to whether Mr. Amoling or Ms. Saster stated she was going "above and beyond" in any area of her work.

22.     Additionally, from the start of her employment until coming out as transgender female part-way into her employment at NETA, Plaintiff received notable pay increases.

**ANSWER:** NETA admits that Ms. Soule received pay increases during the time of her employment, commensurate with her experience on the job but deny that these pay increases were "notable."

23.     During her employment, the NETA work culture was sexist – a "boys club" – and employees, including managers and HR, displayed very negative gay and transgender phobias; management and HR tolerated negative comments about gay and transgender persons, as well as women.

**ANSWER:** Denied.

24.     During her employment, NETA also had a culture which did not respect disability accommodations; for example, security footage of Hanna Koerner ("Ms. Koerner") was reviewed to time her breaks unfairly, while other employees like Samantha Chamberlain were retaliated against after being given accommodations where coworkers would call her a "lazy bitch" and harass her about "faking" her disability to get the first shift.

**ANSWER:** Defendant admits that footage of Hanna Koerner was reviewed but denies the remainder of the allegations in this paragraph.

25.     During her employment, the leads (supervisors), managers, and members of HR were notified of the sexist, homophobic, transgender, and disability-related harassing comments and often even witnessed it, yet nothing was done.

**ANSWER:** Denied.

26.     In fact, there are multiple examples of persons who reported sexual harassment, disability-based harassment, or transgender/gay-related harassment who were pushed out or terminated including Alexandra Sheehan, Esme de Verney, and Brittany Lainhart; later this happened to Plaintiff.

**ANSWER:** Denied.

27.     During her employment, coworkers, supervisors, and managers, frequently discussed women in a sexual manner, such as Matt Saudade, Steve Derosier, her team lead Mr. Samuel, Daniel Arruda (Compliance Officer), and Patrick Barlow (Director of IT); for example, Compliance Officer Daniel Arruda frequently brought up Sarah S. who he said dressed "sluttily" and had "an amazing body," Mr. Samuel, Plaintiff's team lead, commented that he "would love to hit that," and Steve Derosier discussed which was the "hottest" girl at NETA; these comments offended Plaintiff.

**ANSWER:** Denied.

28.     During Plaintiff's employment there were explicit, offensive comments about transgender persons which made Plaintiff keep her transgender transition private as long as she could.

**ANSWER:** Denied.

29.     One example of the openness at which employees bashed and harassed transgender persons occurred while Plaintiff was unloading a truck of growing blocks, while coworkers Chris Brodka and Greg Cotes had the following discussion about transgender women: Chris said "[d]id you see that tranny on that show," Greg and Chris proceeded to put down being "politically correct" about "transgenders", discussed in a derogatory manner what transgender people were

called, and then discussed the actual gender of a transgender person, stating "a dude in a dress is still a dude in a dress"; Greg also stated "[i]f you have a dick, you're a dude."

**ANSWER:** Denied.

30.     In April of 2018, Plaintiff, who still presented as a male at that time, had her one-year review, administered by Mr. Coraccio and Mr. Samuel; Plaintiff was told she was being groomed for first shift, doing openings, to be given extra responsibility.

**ANSWER:** Denied.

31.     Additionally, Steve informed Plaintiff that they "had fought for the highest raise [they] could give [Plaintiff]" because of her great work; her salary increased from $15.50/hr to $16.25/hr.

**ANSWER:** Defendant admits that Plaintiff's salary increased from $15.50/hr to $16.25/hr, but denies the remainder of the allegations in this paragraph.

32.     In May of 2018, and the Director of IT Patrick Barlow ("Mr. Barlow") offered Plaintiff a job working for him; he said he would have to post it internally but that "no one was really qualified [at NETA]" and that the position "was [Plaintiff's] if [she] wanted it" because she was qualified.

**ANSWER:** Denied.

33.     However, within a month or so, by June of 2018, Plaintiff's transition to a female became public, and she was then was "outed" by HR at work; at that point, everything changed.

**ANSWER:** Defendant admits that during this timeframe, Ms. Soule's transition became known at work, but denies that it "outed" Plaintiff and denies that "everything changed" after her transition became known.

34.     For example, Mr. Barlow did not give Plaintiff the job; a less qualified worker was hired.

**ANSWER:** Defendant admits that Ms. Soule did not receive a job in IT, but denies that a less qualified worker was hired.

35.     Plaintiff's coworkers and managers began speculating about Plaintiff's gender identity; coworkers such as Adriana Cardona informed Plaintiff that employees were talking about her.

**ANSWER:** Defendant lacks information sufficient to admit or deny the allegations in this paragraph.

36.     Then, on or about July 25, 2018, Kleona Mihal, an HR representative ("Ms. Mihal"), noticed Plaintiff's gender marker was female after Plaintiff changed it legally on her ID.

**ANSWER:** Defendant is without sufficient knowledge or information to admit or deny the allegations in this paragraph.

37.     Without permission, Ms. Mihal stated she needed to tell one of Plaintiff's bosses, Steve Corracio; she also told Plaintiff she had to speak to Anne Joyce ("Ms. Joyce"), head of HR.

**ANSWER:** Defendant is without sufficient knowledge or information to admit or deny the allegations in this paragraph.

38.      Plaintiff left and cried in the bathroom because she was not ready to come out at work.

**ANSWER:** Defendant is without sufficient knowledge or information to admit or deny the allegations in this paragraph.

39.     Anne Joyce, the head of HR at NETA, directed Plaintiff to meet her the next day.

**ANSWER:** Defendant is unclear as to which date Plaintiff is referring. Defendant admits Ms. Joyce met with Ms. Soule at some point to discuss her transition.

40.     The next day, July 26, 2018, Ms. Joyce first stated to Plaintiff that she "wanted to be careful" as she had "only dealt with this once before at her old company and had handled it poorly."

**ANSWER:** Defendant admits that Ms. Joyce expressed her intention to handle Ms. Soule's transition appropriately and with care. Defendant denies the remaining allegations in this paragraph.

41.     Ms. Joyce then asked Plaintiff "where [she was] in [her] transition."

**ANSWER:** Denied.

42.     Ms. Joyce informed Plaintiff that she was the first person to transition while working at NETA.

**ANSWER:** Defendant admits that Ms. Joyce told Ms. Soule she did not have much experience with transgender issues in the workplace in the context of expressing Ms. Joyce's desire to be supportive of Ms. Soule's transition.

43.     Plaintiff told Ms. Joyce that she wanted to be referred to as Riley, with female pronouns, and to switch locker room facilities.

**ANSWER:** Admitted.

44.     Ms. Joyce responded that her chosen name and pronouns were fine, but switching her to the female facilities was "complicated" and challenging because "[Plaintiff] looked like a girl right now, but [Ms. Joyce] did not know what [Plaintiff] looked like once [she] took [her] clothing off"; Ms. Joyce also asked if Plaintiff had "the surgeries," referring to Plaintiff's genitals.

**ANSWER:** Defendant admits that Ms. Joyce accepted Ms. Soule's chosen name and pronouns, but denies the remaining allegations in this paragraph.

45.     Plaintiff politely responded that it was not acceptable to ask her about her surgeries or medical information related to her transition; nonetheless, Plaintiff explained that due to HRT for almost a year, "[she] had breasts" and was "uncomfortable changing in the men's facilities."

**ANSWER:** Denied.

46.      Ms. Joyce responded that Plaintiff should "just face away from men" while changing so they could not "see anything" or Plaintiff could "wait until they left the locker room."

**ANSWER:** Denied.

47.     Plaintiff responded that she was already doing that but she was very uncomfortable and she was never alone in the locker room.

**ANSWER:** Denied.

48.     Notably, Massachusetts state law has required the allowance that transgender persons use the bathroom/locker room that matches their gender identity for years prior to this time in 2018.

**ANSWER:** This paragraph contains legal conclusions to which no response is required.

49.     Then, without asking Plaintiff's permission or discussing it, Ms. Joyce called Plaintiff's boss Mr. Coraccio on speaker phone and explained that Plaintiff "had something to tell him."

**ANSWER:** Defendant admits only that Ms. Joyce called Mr. Coraccio and indicated that Plaintiff had something to explain to him, but denies she did so without Plaintiff's permission or without discussing first.

50.     Before Plaintiff could say anything, she was forcefully outed to her boss.

**ANSWER:** Denied.

51.     Then, at the end of the meeting, Ms. Joyce still directed Plaintiff to use the men's facilities because the women's facilities were "crowded."

**ANSWER:** Denied.

52.     Of note, Ms. Joyce also told Plaintiff that NETA was working on a gender-neutral bathroom which was never finished while Plaintiff was working there.

**ANSWER:** Denied.

53.     Plaintiff then complained that Ms. Joyce had just been "outed" Plaintiff against her wishes.

**ANSWER:** Denied.

54.     Ms. Joyce did not apologize and started to discuss Plaintiff's coming out plan.

**ANSWER:** Defendant admits that it discussed a coming out plan with Plaintiff at some point in time, but denies the remainder of the allegations in this paragraph.

55.     Ms. Joyce agreed to not share her transition until Plaintiff had shared it with managers herself; it was also agreed that Plaintiff's medical information related to her transition would not be shared.

**ANSWER:** Denied.

56.     After the meeting, Plaintiff had her NETA ID changed to her name and she took a new ID photo, as Ms. Joyce had also agreed to a new ID.

**ANSWER:** Admitted.

57.    However, when Plaintiff got to work on July 30, 2018, her old badge (old picture with a beard and old name) was waiting for her instead of the new badge with "Riley" and a new picture on it.

**ANSWER:** Defendant admits that around this time, Plaintiff retained her old badge but lacks knowledge as to the specific date.

58.    Plaintiff raised this concern to Mr. Samuel as Plaintiff came through security that day, but he just shrugged, and then directed Plaintiff to change in the *men's room*, then to go see HR after that.

**ANSWER:** Defendant lacks sufficient knowledge or information to admit or deny these allegations.

59.    On her way to HR, Plaintiff was stopped by Dave Ovalman, one of the top leaders at NETA, who indicated he knew of her transition even though Plaintiff had not come out to him as agreed with Ms. Joyce; in other words, NETA disclosed this information without consent.

**ANSWER:** Defendant admits that Ms. Joyce spoke with Mr. Ovelman to regarding an employee who wished to begin using the female facilities, but denies the remainder of the allegations in this paragraph.

60.    Once at HR, Plaintiff asked Anne Joyce how Dave Ovalman knew about her transition and Ms. Joyce stated she "had to loop him in"; Plaintiff complained that was not their agreement.

**ANSWER:** Defendant admits that Ms. Joyce had to tell Mr. Ovelman about the change in facilities, but denies the remainder of the allegations in this paragraph.

61.    Plaintiff also complained that her NETA ID still had her old name and photo.

**ANSWER:** Admitted.

62.    Ms. Joyce stated that the ID had to have her legal name.

**ANSWER:** Defendant admits that Ms. Joyce informed Ms. Soule that her ID had to match her legal name as indicated on her license.

63.    In response, Plaintiff told Ms. Joyce that other employees had nicknames that were not their legal name on badges including Alexandra Sheehan, shortened to Allie Sheehan and Adam Greenie, changed to A.J. Greenie; Ms. Joyce denied knowledge of these badges with nicknames.

**ANSWER:** Admitted.

64.    Plaintiff told Ms. Joyce that she felt the differential treatment was discriminatory.

**ANSWER:** Denied.

65.    Ms. Joyce did and said nothing in response to that complaint of discrimination; worse, Ms. Joyce informed Plaintiff she could only use the women's locker room when "no women" were in there to not "upset any of the female employees," or, that Plaintiff could use the men's locker room.

**ANSWER:** Denied.

66.    Plaintiff complained that she "was a woman" and "felt discriminated against" by Ms. Joyce's statement that Plaintiff's use of that bathroom would upset "the female employees."

**ANSWER:** Denied.

67.    Ms. Joyce did nothing in response to the additional complaint of discrimination by Plaintiff.

**ANSWER:** Denied.

68.    Plaintiff left that meeting with Ms. Joyce, head of HR, feeling ostracized due to her transition.

**ANSWER:** Defendant is without sufficient knowledge or information to admit or deny the allegations in this paragraph.

69.   Soon after this, in very early August of 2018, Plaintiff was approached by Anne Marie Blood ("Ms. Blood"), a subordinate of Ms. Joyce in HR, who said she was "taking over [Plaintiff's] *situation*" because she "understood" her transition since she had a (minor) transgender son (who she inappropriately shared with Plaintiff was about to start testosterone).

**ANSWER:** Defendant admits that Ann-Marie Blood began working with Ms. Soule on her transition at work and disclosed that her son was also in the process of transitioning, but denies the remaining allegations in this paragraph.

70.    Ms. Blood promised Plaintiff that they would both talk to the team leads in person to inform them of Plaintiff's name / pronouns, then the leads would disseminate the information to the staff *after* that; Plaintiff emphasized that she wanted to tell her own managers and coworkers first and they agreed again that the sharing of medical information would not occur.

**ANSWER:** Defendant admits that they agreed they would inform the team leads about Plaintiff's name and pronouns and that they would disseminate the information to the staff, but denies the remainder of the allegations.

71.    On or about the next day, August 6, 2018, as Plaintiff walked through her workplace her coworkers, using her new name and pronouns, congratulated her on "finally being out at work", and one coworker, Esme du Vernay, hugged Plaintiff stating he was proud of her.

**ANSWER:** Defendant lacks knowledge or information sufficient to admit or deny the allegations contained in this paragraph.

72.     Given that Plaintiff had not authorized the sharing of her transition that soon and without her knowledge, Plaintiff was shocked.

**ANSWER:** Denied.

73.     Plaintiff was informed by employees, including a supervisor, Alexandra Sheehan, that all of the team leads had been informed by management/HR *in email;* Plaintiff was told the supervisors/leads were instructed to call a morning meeting with all staff to tell all employees *not just that* Plaintiff was transgender, but also about her medical information such as being on HRT.

**ANSWER:** Defendant admits that Ms. Blood informed the team leads about Ms. Soule's transition, per their agreement, but denies the remainder of the allegations in this paragraph.

74.     Other coworkers confirmed to Plaintiff that *all other team leads* had *also* held meetings that morning sharing Plaintiff's transgender status and her private medical information.

**ANSWER:** Denied.

75.     None of this sharing was authorized by Plaintiff; thus, NETA violated Plaintiff's right to privacy.

**ANSWER:** Denied.

76.     Further, unauthorized sharing of a transgender person's medical information is harassment/discrimination based on Plaintiff's gender-identity.

**ANSWER:** This paragraph contains legal conclusions to which no answer is required. To the extent a response is required, these allegations are denied.

77.     Plaintiff thus complained to Ms. Blood about NETA staff being told without her authority.

**ANSWER:** Denied.

78.     Plaintiff also complained she never authorized the sharing of her private medical information, such as that she was on HRT, to be disseminated to all leadership and all staff.

**ANSWER:** Denied.

79.     Ms. Blood did and said nothing in response to this complaint such as start an investigation.

**ANSWER:** Denied.

80.     Two days later on August 8, 2018, Plaintiff emailed Ms. Blood complaining that she still needed a female uniform; Ms. Blood did not even respond to Plaintiff until August 17, 2018.

**ANSWER:** Defendant admits that Ms. Blood was unable to address the uniform request until August 17, 2018, as she was out of the country, but denies that she "did not [] respond" as she had an out of office message that advised Ms. Soule of Ms. Blood's absence.

81.     Plaintiff did not receive her uniform until October of 2018.

**ANSWER:** Defendant admits that due to a shipment issue, Plaintiff did not receive her new uniform until October of 2018.

82.     When Plaintiff did receive her uniform, it was a mix of men's and women's uniform parts, which were distinctly different from each other; this was not remedied for a long time despite complaints.

**ANSWER:** Defendant lacks knowledge or information sufficient to admit or deny the allegations in this paragraph.

83.    Around the same time, Plaintiff also first started to complain about her PTSD being triggered at work such as when John, a per diem security officer, loudly watched violent videos of people getting killed, including many by military convoys exploding due to IEDs at work.

**ANSWER:** Defendant lacks knowledge or information sufficient to confirm or deny the allegations in this paragraph.

84.    Plaintiff reported this action to Mr. Samuel as triggering her PTSD but he did not stop it.

**ANSWER:** Defendant lacks knowledge or information sufficient to confirm or deny the allegations in this paragraph.

85.    In late August 2018, Plaintiff reported to Ms. Mihal of HR that she had legally changed her name and submitted her temporary license so she could get her IDs changed.

**ANSWER:** Although Ms. Mihal is no longer at NETA, on information and belief, Defendant admits that Plaintiff reported to Ms. Mihal that she needed to update her ID.

86.    When Plaintiff received her new RMD license, it still had her old picture with a beard.

**ANSWER:** Admitted.

87.    Plaintiff complained to HR and asked Ms. Mihal to call the state to fix it.

**ANSWER:** Defendant denies that Complainant complained to "HR" about this issue in 2018. Defendant is without sufficient knowledge or information to admit or deny the allegations in this paragraph.

88.    Ms. Mihal informed Plaintiff that NETA failed to submit her picture to the Department that handled the license and she would now have to wait until 2019 to change the picture.

**ANSWER:** Defendant is without sufficient knowledge or information to admit or deny the allegations in this paragraph.

89.   This made no sense as Plaintiff had supplied NETA a new picture for her RMD license and the regulations required that her picture look like her, but it was still not changed.

**ANSWER:** Defendant admits that Plaintiff supplied a new picture and that the picture was not changed, but denies the remaining allegations in this paragraph.

90.   Ms. Mihal said she would look into it with the higher ups but after checking, denied Plaintiff's request because the higher ups were "not going to re-submit the paperwork."

**ANSWER:** Defendant denies that Ms. Mihal ever checked with "the higher ups," but is without sufficient knowledge or information to admit or deny the remaining allegations in this paragraph.

91.   After Plaintiff's continued complaints, Mihal promised to look into it again and never did.

**ANSWER:** Defendant is without sufficient knowledge or information to admit or deny the allegations in this paragraph.

92.   Notably, in 2019 when Plaintiff's RMD license expired, her new ID *again* had her old photo (a male with a beard) because NETA failed to supply Plaintiff's new photo a second time.

**ANSWER:** Admitted.

93.   Despite instructions to the contrary, many of Plaintiff's coworkers misgendered Plaintiff, calling her a "him"; these coworkers did this intentionally as a way to harass Plaintiff because of her gender-identity, and it was done at a frequency of several times per week from that time in mid-2018 until July of 2019, her last day of work before her separation.

**ANSWER:** Denied.

94.   For example, in September of 2018, Plaintiff's coworker Eloy Tee ("Mr. Tee") referred to her as "bro"; Plaintiff, thinking it was an honest mistake, joked "it's actually sis lol" and he responded "okay"; later Mr. Tee did it again after Plaintiff formally informed him that she

needed to be called a "her," Mr. Tee continued to do this until Plaintiff's last day of work in July 2019.

**ANSWER:** Denied.

95.    Similarly, the team lead in cultivation, Will Remington III, and the cultivation manager, Brian Bart, intentionally referred to Plaintiff as he, him, his, sir, bro, dude, and man, intentionally harassing her and did so consistently, weekly, until her last day of work in July of 2019.

**ANSWER:** Denied.

96.    Additionally, Matt Lowther, the head of production, continually used male terms for Plaintiff as well, despite Plaintiff correcting him and directly asking him to "please stop"; like other gender-identity related harassment, this also continued until Plaintiff left NETA in July of 2019.

**ANSWER:** Denied.

97.    Plaintiff reported all of the above to Mr. Samuel who said he would look into it; still no swift remedial action was taken and no investigation was ever commenced.

**ANSWER:** Defendant lacks knowledge or information sufficient to confirm or deny the allegations in this paragraph.

98.    Plaintiff continued to report these harassing comments through 2018 and 2019, until her last day in July 2019, to managers, supervisors, leads, and HR; nothing was ever done.

**ANSWER:** Denied.

99.    By October 18, 2018, Plaintiff's condition of PTSD was formally recognized by the military; specifically, Plaintiff was deemed to be 50% disabled due to PTSD by the military.

**ANSWER:** Defendant is without knowledge or information sufficient to admit or deny the allegations in this paragraph.

100.    In October of 2018, Plaintiff took a lateral move to get away from the cultivation crew who harassed her about her gender identity.

**ANSWER:** Denied.

101.    Around that same time, in or around October of 2018, coworkers started to touch and interrupt Plaintiff intentionally; Plaintiff asked them to stop due to her PTSD and in response, they started to intentionally sneak up behind her and yell "Wooo!" six inches from her ear.

**ANSWER:** Denied.

102.    These acts of harassing Plaintiff by intentionally startling her, interrupting her, and yelling around her, was done because of Plaintiff's PTSD; this continued through July of 2019 as well.

**ANSWER:** Denied.

103.     Plaintiff reported these acts to NETA, specifically to her supervisors, managers, and HR; she specifically reported that being touched, startled, or interrupted were problematic due to her disability of PTSD but nothing was done by NETA, including no investigation or remedy.

**ANSWER:** Denied.

104.    However, in response to Plaintiff's complaints, NETA staff, then supervisors and management, began targeting and harassing her about not being happy/friendly enough.

**ANSWER:** Denied.

105.    Plaintiff began to come across as more depressed at work due to all of the aforesaid events which in turn increased the harassment of Plaintiff to "smile."

**ANSWER:** Denied.

106.    Coworkers would tell her to smile, even when Plaintiff explained she was going through mental health challenges related to her disability and after asking them to stop; telling Plaintiff to smile became the next thing that coworkers harassed Plaintiff about due to her disability.

**ANSWER:** Denied.

107.    From this time through May of 2019, coworkers, including new ones, jumped on the bandwagon of incessantly telling Plaintiff to smile, causing Plaintiff increased distress at work.

**ANSWER:** Denied.

108.    For example, Rachel Richards put sticky notes with the words "remember to smile" throughout Plaintiff's work area several times per week; this also continued until Plaintiff's separation.

**ANSWER:** Defendant admits that Rachel Richards put sticky notes throughout the work area with quotes and phrases to encourage her coworkers, but denies that she targeted Plaintiff or her work area in particular.

109.    Plaintiff reported these behaviors to her supervisors, managers, and eventually HR to no avail.

**ANSWER:** Denied.

110.    In early 2019, an internal position for lead was posted and Plaintiff applied.

**ANSWER:** Denied.

111.    Due to all of the coworkers yelling, harassing her about smiling, deadnaming and misgendering Plaintiff (gender-identity harassment), as well as due to coworkers intentionally

interrupting and touching Plaintiff their own amusement, Plaintiff began making mistakes in her work at times.

**ANSWER:** Defendant admits that Plaintiff made mistakes in her work, but denies the remainder of the allegations in this paragraph.

112.    On one occasion in or about mid-February 2019, Plaintiff made a mistake in printing a second set of labels; in reality this was the packaging department's error in sending duplicate requests, however, as it was Plaintiff's responsibility to double check labeling projects and while doing so, she had been distracted and failed to discover the erroneous duplicate order from the packaging department.

**ANSWER:** Defendant admits that Plaintiff made a mistake in printing labels, but denies the remainder of the allegations in this paragraph.

113.   Plaintiff expressed to her manager Mr. Amoling, as she had before, that the interruptions and distractions from coworkers were sometimes causing her to make errors and asked for his help.

**ANSWER:** Defendant admits that Plaintiff said she was sometimes distracted and that this caused her to make errors.

114.   Mr. Amoling confirmed that the error was because of the packaging department and thus told Plaintiff that "it was not a big deal" and that Plaintiff was not in trouble; Mr. Amoling did not address the concerns Plaintiff raised about interruptions by several coworkers and mistakes.

**ANSWER:** Denied.

115.   However, soon after, Plaintiff found herself written up – *with a second-level disciplinary action of a written warning rather than a first level notation of conversation.*

**ANSWER:** Defendant admits that Plaintiff received a write-up but denies the remainder of the allegations in this paragraph.

116.    Upon information and belief, Plaintiff had become a "problem" employee due to the protected acts of complaining about her coworkers and her supervisors/managers' failures to remedy the problems; retaliation thus began to ensue.

**ANSWER:** Denied.

117.    In the discussion of the write-up, Plaintiff expressed shock and concern that she was written up for a mistake that Mr. Amoling had expressly stated was "no big deal" and was caused by a different department; of importance, it was also the kind of mistake that similarly-situated non-transgender, non-disabled, non-complaining employees made and were not written up in response to.

**ANSWER:** Denied.

118.    Also, similarly-situated non-transgender, non-disabled, non-complaining employees were first given a "notation of conversation" corrective action, which is specified as the first-level corrective action on the corrective action forms and *in the employee handbook*.

**ANSWER:** The allegations contained in this paragraph concerns a document which speaks for itself.  Defendant denies that the first level of corrective action must be a verbal warning in every instance and admits that similarly-situated non-transgender, non-disabled, non-complaining employees are often given a verbal warning before a written warning, as was the case for Ms. Soule.

119.    Instead, Plaintiff's first corrective action – in approximately two years of flawless work and work-behavior – was the second-level written warning.

**ANSWER:** Denied.

120.    Additionally, Mr. Amoling had included on that write-up a prior unknown "error" which was a barcode that Mr. Amoling himself knew had passed through several quality checks and was working, raising the question of if the barcode was even defective to begin with.

**ANSWER:** Denied.

121.    Specifically, Plaintiff had printed one and scanned it, as well as had another inventory specialist scan it, and it worked; she then printed the rest.

**ANSWER:** Defendant is without knowledge or information sufficient to admit or deny the allegations in this paragraph.

122.    Then, the formal quality checking process at NETA included that barcode was first printed by Plaintiff and first quality checked by her, then by the packaging department, then by a different inventory specialist, then by the vault personnel, and then a final quality check at the dispensary.

**ANSWER:** Admitted.

123.    At the vault, Plaintiff even witnessed Chris Ash scan the barcode which scanned just fine; moreover, all of those quality checks found the barcode worked or it would not have made it to the dispensary where it was suddenly found as faulty according to Mr. Amoling.

**ANSWER:** Defendant is without knowledge as to whether Plaintiff witnessed Chris Ashe scan the barcode, but denies that the barcodes were created properly as this is not possible if they were later found to be faulty.

124.    Despite the unlikeliness of this error being attributable to Plaintiff, or even being an error, Mr. Amoling used the "error" to justify a second-level *written* warning.

**ANSWER:** Denied.

125.   Similarly-situated, non-transgender, non-disabled employees were not treated this way.

**ANSWER:** Denied.

126.   Moreover, the second-level write-up included "infractions" for Plaintiff having a "negative attitude", yet no one had spoken to Plaintiff so she had no idea what this was in reference to, other than her being upset by coworkers continuing to harass her about smiling incessantly.

**ANSWER:** Defendant admits that issues with Plaintiff's attitude were noted on her written warning, but denies the remainder of the allegations in this paragraph.

127.   Lastly the write up also mentioned the act of "white board misuse" for Plaintiff writing "Riley was Here," "Riley was here again," and "Print Labels, Count Stuff."

**ANSWER:** The allegations in this paragraph concern a document which speaks for itself.

128.   In actuality, the "Print Labels, Count Stuff" was in reaction to joking around with top executive Dave Ovelman when a whiteboard near Plaintiff's desk fell and Mr. Ovelman jokingly wrote "Hang Whiteboard" on the whiteboard; in response, and with Mr. Ovelman's encouragement and full support, Plaintiff wrote "Print Labels, Count Stuff" and they laughed.

**ANSWER:** Defendant admits that writing "Hang Whiteboard" was in response to a joke with Mr. Ovelman, but denies the remainder of the allegations in this paragraph.

129.   Moreover, the "Riley was Here" and "Riley was Here Again" was written on the vault whiteboard when Plaintiff dropped product off and no one was in the vault to receive it; "Riley was Here (Again)" was written on the whiteboard in the vault for the same reason along with the product she was dropping off which was left directly in front of the white board.

**ANSWER:** Defendant is without knowledge or information sufficient to admit or deny why Plaintiff decided to use the white board in this manner.

130.    In other words, the use of the whiteboard was either for fully legitimate work purposes of informing vault staff where product had come from or was done in jest with the encouragement and participation of a senior leader.

**ANSWER:** Denied.

131.    Similarly-situated, non-transgender, non-disabled employees were not given a second-level write-up for legitimate work activities and joking with the encouragement of leadership.

**ANSWER:** Defendant lacks knowledge as to what Plaintiff means by "legitimate work activities," but admits that no employees are given write-ups for appropriate workplace behavior or conduct that falls within their job duties.

132.    Due to having the sudden written warning, Mr. Amoling told Plaintiff that she no longer was qualified for, and could not be interviewed for, the lead position that she had applied for.

**ANSWER:** Denied.

133.    At that same time, in a meeting with HR's Ms. Blood and Mr. Amoling, Plaintiff again reported the intentional interruptions and harassment that had become a pattern with Plaintiff's coworkers.

**ANSWER:** Denied.

134.    Ms. Blood's response was to simply state "use a notepad" to address the reported intentional interruptions, ignoring the entire point that coworkers were intentionally harassing Plaintiff.

**ANSWER:** Defendant admits that Ms. Blood suggested that a notepad could reduce interruptions but denies the remainder of the allegations.

135.    Then, in or around the same time, NETA hired an employee named Don, according to NETA on February 14, 2019, and he immediately began harassing Plaintiff by commenting on her appearance, her body, her hair, and frequently finding her at work, incessantly talking to Plaintiff, and making Plaintiff very uncomfortable.

**ANSWER:** Denied.

136.    Don also followed Plaintiff around and was always present where she was, which made her even more uncomfortable.

**ANSWER:** Denied.

137.    Further, Don would wait outside of the bathroom for Plaintiff while she was using it and on the first instance of Don doing this, in or about February 2019, Don actually opened the door and when Plaintiff replied, "I'm in here, using the bathroom," he repeatedly demanded Plaintiff identify herself, despite Plaintiff telling him to leave.

**ANSWER:** Denied.

138.    Plaintiff reported this event to Ms. Saster who stated she would report it to management.

**ANSWER:** Denied.

139.    However, Don's behavior continued; Don would then wait outside the bathroom and locker room until Plaintiff came out and tried to talk to her then nearly, if not actually, daily.

**ANSWER:** Denied.

140.    Plaintiff also reported these incidents to Ms. Saster and Ms. Saster promised she would talk to leadership "again" but Don's harassment still never stopped.

**ANSWER:** Denied.

141.   Additionally, on a near-daily basis, Don would make comments such as "I've never seen you with your hair up, you look nicer/prettier with it down," "why are you wearing a baggy sweatshirt right now, it's so warm, you must be sweating right now...it would look cuter without a baggy one on," and how he "hadn't seen [Plaintiff] in leggings but [he] thought [she] looked good in them" and that Don "liked seeing [her] in leggings."

**ANSWER:** Denied.

142.   At first Plaintiff asked Don to stop making comments about her appearance as it made her uncomfortable but he did not stop.

**ANSWER:** Denied.

143.   Notably, these comments, which occurred from February through May of 2019, were often made in front of others, including supervisors/leads, and were always reported to Plaintiff's supervisor Ms. Saster, her manager Mr. Amoling, and other supervisors, managers, and leaders such as:

a.        The "leggings" and "looking good" comments were made in front of (at the time) team lead Steve Finney; later that night Plaintiff further complained to Mr. Finney that Don made such comments regularly which gave her panic attacks and soon after reported this to both Ms. Saster and Mr. Amoling who said they would handle it but did nothing.

b.        Plaintiff also reported the "baggy sweatshirt/look cuter without" comment immediately to Mr. Amoling and also to Ms. Saster who again did nothing.

c.        Plaintiff also reported the hair-related comments, about how it would look prettier or nicer with it down, to Mr. Amoling and Ms. Saster; they did nothing.

d.        Felicia, another team lead, witnessed one of these comments and gave Plaintiff a disgusted look in response to the comment, recognizing its inappropriateness.

**ANSWER:** Denied.

144.   Understandably, as time went on into March and April of 2019, Plaintiff also reported to Ms. Saster, her supervisor, that she was feeling "very unsafe at NETA due to Don".

**ANSWER:** Denied.

145.   Notably Don was being reported for much less serious behavior while Ms. Saster and Mr. Amoling ignored Plaintiff's complaints; for example, Adam Freed, a high-level Operations Manager, had been told about *other* complaints by staff related to Don *interrupting* workers, which he addressed in email to Don's supervisor, while Ms. Saster and Mr. Amoling did nothing in response to Plaintiff's several complaints of Don harassing her with comments.

**ANSWER:** Defendant admits that Mr. Freed informed Mr. Frigon's supervisor that Mr. Frigon was interrupting other employees, but denies the remainder of the allegations in this paragraph.

146.   More specifically, Adam Freed wrote an email on or about March 21, 2019, stating that "two different staff members came up to me today mentioning that he had been distracted [sic] them while they are working. The same has been true for me – I'll be working late and he will start talking to me. I do not want to be rude – just wanted to mention it to y'all."

**ANSWER:** Admitted.

147.   Ms. Saster and Mr. Amoling did not take any action in response to Plaintiff's complaints.

**ANSWER:** Denied.

148.    Further, in or about March of 2019, Plaintiff expressly reported to Mr. Amoling that Don was so distracting he was causing Plaintiff to make mistakes; Plaintiff stated that she "wanted it to stop."

**ANSWER:** Denied.

149.    Also, into March of 2019, other coworkers increased their intentional harassment because of Plaintiff's disability; for example, Samir Addo ("Mr. Addo"), a team lead, escalated the screaming of "WOO!" in Plaintiff's ear despite Plaintiff asking him to stop due to her PTSD.

**ANSWER:** Denied.

150.    Then, following Mr. Addo's lead, the packaging team started screaming "WOOO!" at Plaintiff.

**ANSWER:** Denied.

151.    From March 2019 through July 2019, yelling "WOOO" at Plaintiff, in her ear, and in front of Plaintiff, intentionally, was a common pastime for coworkers and supervisors/leads.

**ANSWER:** Denied.

152.    Those leads/supervisors partaking in the harassing action included Tim Hannah (packaging supervisor), Basil, Ray, John (all packaging team leads), Mike Viollette (IS team lead), in addition to Mr. Addo (joint roller team lead).

**ANSWER:** Denied.

153.    Steven Finney, a lead at the time, witnessed this but did not partake in the "Wooo" harassment.

**ANSWER:** Defendant admits that Steven Finney did not partake in any harassment, but denies the remaining allegations in this paragraph.

154.   Plaintiff reported all of these triggers of her PTSD to her supervisor/managers and to HR; in response there was no investigation, no write-ups for the harassing employees, and nothing done.

**ANSWER:** Denied.

155.   Also in March of 2019, Plaintiff expressly reported to Mr. Amoling, again, that Don had stated that she "looked really good" and he was "still making [her] uncomfortable"; Mr. Amoling, again promised he would take care of it but did nothing.

**ANSWER:** Denied.

156.   Also in or around this time in March of 2019, Plaintiff began to be criticized by leads for being "hostile" when in reality, Plaintiff was reacting to intentional acts of gender-identity harassment and disability-harassment such as Team leads Ray, John, and Basil intentionally touching Plaintiff or waiving hands in her face rather than write questions in the agreed-upon notebook.

**ANSWER:** Denied.

157.   In early April 2019, Don was particularly distracting and upsetting to Plaintiff in times that were subject to mistakes such as converting products with SKUs in her head; one time while doing so, Don started commenting about her body, which led to error.

**ANSWER:** Denied.

158.   In one instance, Don was commenting about how nice Plaintiff looked in her leggings which shocked and distracted Plaintiff, leading to an error she did not catch right away.

**ANSWER:** Denied.

159.   Likewise, in another example while Don was commenting on Plaintiff's hair, with supervisor Felicia in the room, and Plaintiff clicked the wrong data to fill a form template and did not notice.

**ANSWER:** Denied.

160.   On April 11, 2019, Plaintiff was made to meet with supervisors/managers and HR again.

**ANSWER:** Denied.

161.   During that meeting, Plaintiff re-reported to Mr. Amoling and Ms. Blood that the coworker harassment continued including that more had now started to tell her to smile, waive their hands in her face, were repeatedly tapping her shoulders, yelling "Wooo!" and making harassing comments such as those Don was making which she complained caused her to make errors.

**ANSWER:** Denied.

162.   In this meeting, Plaintiff also first formally requested a disability accommodation; Ms. Blood failed to engage in an interactive process.

**ANSWER:** Denied.

163.   Moreover, in this meeting, Plaintiff specifically told Mr. Blood of HR and Mr. Amoling, Plaintiff's manager, that Don's harassment and interruptions were causing her "mental health suffering."

**ANSWER:** Denied.

164.   Mr. Blood and Mr. Amoling's response was *that was Plaintiff's problem*, and since they stated they had "already talked to him" and it was "unlikely" he was still "bothering" her.

**ANSWER:** Denied.

165.   During that meeting, Plaintiff was again suddenly written up for the two errors caused by Don's distraction and one error related to a *known new problem* with the label tested-on date mistakenly printing as 1899, which was happening to others as well.

**ANSWER:** Denied.

166.   As to the 1899 mistake, it was a software error so recently discovered that it was not yet on the quality forms at that time; it would occur sometimes when the employee loaded in the data which was supposed to change the 1899 date to the proper date and the software was malfunctioning.

**ANSWER:** Defendant admits only that Plaintiff's 1899 mistake was not specifically part of the quality forms at the time, but generally ensuring labels have correct information was part Plaintiff's job duties at the time. Defendant otherwise denies the remaining allegations contained in this paragraph.

167.   Thus, this write-up was for two acts resulting from the continually reported problem of Don interrupting Plaintiff by sexually harassing her and one "mistake" occurring to others.

**ANSWER:** Denied.

168.   Moreover, that write up was only her second ever at NETA, in approximately two years, with no first "notation of conversation," yet it was listed as her last and final warning.

**ANSWER:** Defendant denies that Plaintiff did not receive a verbal warning, but admits that this write up was a final warning.

169.   Similarly-situated non-disabled, non-transgender employees are not given a last and final on their second warning ever or given a last and final write-up for these types of alleged work errors.

**ANSWER:** Denied.

170.    In fact, only minutes after returning from the meeting where she was written up, Mr. Amoling approached Plaintiff's coworkers Grant Linnehan ("Grant") and Mike Tweedly ("Mike") to talk across the hall; Plaintiff heard laughing and both coworkers returned with an upbeat mood.

**ANSWER:** Defendant admits that Mr. Amoling had a discussion with Mr. Linnehan and Mr. Tweedly around this time but denies the remaining allegations in this paragraph.

171.    When Plaintiff asked what happened, Grant informed her that Mr. Amoling wanted to discuss *labeling errors* with them *so he would "not have to put them down on paper*."

**ANSWER:** Defendant admits that NETA issued these employees verbal warnings, rather than written warnings, as it was their first errors but otherwise denies the allegations contained in this paragraph.

172.    Plaintiff told Grant that Mr. Amoling had just written her up for a particular labeling error – a 1899 mistake; Grant stated that mistake was brought up for him too but he was not written up.

**ANSWER:** Defendant admits that Mr. Amoling gave Mr. Linnehan a verbal warning for his error but is without knowledge or information sufficient to admit or deny the remaining allegations regarding what Grant told Plaintiff.

173.    On April 17, 2019, days after this meeting, Plaintiff contacted Dave Ovalman, senior leadership at NETA, stating that she had concerns.

**ANSWER:** Denied.

174.   Plaintiff spoke to him on April 23, 2019, and reported that she was being targeted since complaining to Mr. Amoling, Ms. Saster, and Ms. Blood about coworker harassment and that she received her second write-up for the same mistakes that coworkers were not punished for.

**ANSWER:** Denied.

175.   Mr. Ovalman stated that Mr. Amoling was "not that type of person" to target her but promised to "look into it" and "get to the bottom of it" and stated he would follow up with Plaintiff.

**ANSWER:** Denied.

176.   In that meeting, Plaintiff explicitly complained to Mr. Ovalman about Don's harassment and stated that Don's comments were "negatively affecting [her] and [her] work performance"; she also explicitly shared her diagnosis of PTSD, the ongoing coworker harassment, and the harsh, disparate treatment by Mr. Amoling and Ms. Saster which were all "throwing [her] out of wack."

**ANSWER:** Denied.

177.   Mr. Ovalman did not respond to her report of harassment and retaliation.

**ANSWER:** Denied.

178.   Instead, he only asked Plaintiff (inappropriately) how she got PTSD.

**ANSWER:** Denied.

179.   Mr. Ovalman never followed up, no investigation was started, and nothing was remedied.

**ANSWER:** Denied.

180.   In response however, Mr. Ovalman began to treat Plaintiff negatively himself.

**ANSWER:** Denied.

181.    For example, prior to Plaintiff's report to Dave, he would say goodbye to her at the end of the day regularly, but stopped doing this right after Plaintiff complained to him.

**ANSWER:** Denied.

182.    On April 25, 2019, Plaintiff received her new RMD license which had her new name but *still* had the photo presenting Plaintiff as a man with a beard which NETA promised would be fixed.

**ANSWER:** Defendant admits that Plaintiff received a new RMD license with the old photo due to the bureaucratic processes of the RMV and EOHHS.

183.    Plaintiff emailed Ms. Mihal and she *again* said she would investigate it but did not; through Plaintiff's remaining employment, Ms. Mihal never responded and the license was never fixed.

**ANSWER:** Defendant admits that Plaintiff emailed Ms. Mihal about her RMD license and that Ms. Mihal said she would look into it. Defendant is without sufficient knowledge or information to admit or deny the remaining allegations in this paragraph.

184.    On May 2, 2019, Plaintiff checked the Franklin MIP Inventory Specialist Nightly Email for directions and saw one of the team leads had written "SMILE!" under "other reminders"; this was intended to harass Plaintiff.

**ANSWER:** Denied.

185.    Due to these events, Plaintiff had frequent panic attacks at work and her depression worsened.

**ANSWER:** Defendant is without knowledge or information sufficient to admit or deny the allegations in this paragraph.

186.    Additionally, Don continued to make harassing comments to Plaintiff, wait outside of the bathroom, seek her out, follow her/end up where she was, and intentionally interrupt her.

**ANSWER:** Denied.

187.    On May 6, 2019, as Plaintiff was getting ready for work, she was overwhelmed with suicidal thoughts; she decided to take all of her medication and jump off the bridge on Highway 99.

**ANSWER:** Defendant is without knowledge or information sufficient to admit or deny the allegations in this paragraph.

188.    Plaintiff told her partner Remi that she was planning to commit suicide and Remi followed the plan created by Plaintiff's doctors in such an event which is common with PTSD.

**ANSWER:** Defendant is without knowledge or information sufficient to admit or deny the allegations in this paragraph.

189.    At the VA hospital, Plaintiff was admitted for inpatient care; Remi contacted Ms. Saster.

**ANSWER:** Defendant lacks knowledge as to whether Plaintiff was admitted for inpatient care at the VA hospital. Defendant admits that Remi contacted Ms. Saster.

190.    While Plaintiff was still being admitted, Ms. Blood called Remi who told Ms. Blood Plaintiff was in emergency and she could not talk but Ms. Blood stated she had to talk right then to "handle [Plaintiff's] leave correctly."

**ANSWER:** Denied.

191.    Still while Plaintiff was being admitted to the hospital, Ms. Blood kept Remi on the phone asking inappropriate questions about Plaintiff's suicidal thoughts, Plaintiff's PTSD, and her private medical information; Ms. Blood stated the information was to "assess how long she might need leave for" and kept asking when Plaintiff would return to work which, Remi could not answer.

**ANSWER:** Denied.

192.    Remi relayed that Plaintiff had fear about losing her job because she had to go to the hospital; Ms. Blood oddly responded by stating that Plaintiff had "emotional problems," and then launched into Plaintiff's write-ups and "costly mistakes."

**ANSWER:** Denied.

193. Remi responded that the mistakes she knew of were due to failures by NETA to remedy harassment and its failure provide accommodations for Plaintiff's PTSD.

**ANSWER:** Denied.

194. Remi also then reported what Plaintiff had reported several times, that a coworker was harassing her with comments about her appearance, seeking her out, waiting outside the bathroom, and perpetrating other harassing and intimidating behavior.

**ANSWER:** Defendant admits that Remi brought this issue to Ms. Blood's attention at this time, but denies that "Plaintiff had reported [the issue] several times."

195. Ms. Blood responded that "no one had reported" that, which Remi told Ms. Blood was untrue as it had been reported multiple times.

**ANSWER:** Defendant admits that Ms. Blood said that no one reported the situation previously, but denies the remainder of the allegations.

196. Ms. Blood then responded "I have a pretty good idea" and that "there was one guy on the environmental service team who had been an issue," seemingly referring to Don.

**ANSWER:** Defendant admits only that when Remi Soule identified that the individual involved was a male janitor that Ms. Blood indicated she thought she might know who was she referring to, but denies all other allegations in this paragraph.

197. Ms. Blood stated she "would handle it."

**ANSWER:** Defendant is without knowledge or information sufficient to admit or deny the allegations in this paragraph.

198. Plaintiff was out on FMLA from that day on May 6, 2019, until June 24, 2019.

**ANSWER:** Admitted.

199. While on FMLA Plaintiff was contacted by several coworkers including Steve Finney and Katie Piccinin; later they told Plaintiff that the team leads directed them to contact her and report back.

**ANSWER:** Defendant is without knowledge or information sufficient to admit or deny whether Steve Finney contacted Plaintiff. Defendant admits that Katie Piccinin reached out to Ms. Soule to see how she was doing at the suggestion of Ava Saster but denies that Ms. Saster directed her to do so or that Ms. Saster directed Ms. Piccinin to "report back."

200. Plaintiff returned to work on June 24, 2019 with a formal list of disability accommodations.

**ANSWER:** Admitted.

201. The list included things that Plaintiff was asking for prior to her FMLA leave, and included:

a.              Plaintiff be provided with a quiet workspace;

b.         Coworkers be prevented from needlessly touching or distracting Plaintiff;

c.         Don be prevented from coming near Plaintiff,

d.         Plaintiff should be counseled when mistakes were made, not much later;

e.         The disability-related comments be removed from her write-ups; and

f.         Plaintiff be allowed the as-needed use of an icepack and headphones.

**ANSWER:** The allegations in this paragraph concern a document which speaks for itself.

202. Ms. Blood stated it "made sense" Plaintiff did not want to be touched; that was "not a problem."

**ANSWER:** Admitted.

203.    Ms. Blood stated it would not be a problem to keep Don away as he was "on a final warning and if he approached Plaintiff he would be fired"; the leads were required to enforce this directive.

**ANSWER:** Defendant admits that Ms. Blood stated Mr. Frigon should not interact with Ms. Soule, but denies the remainder of the allegations.

204.    Ms. Blood also agreed it "sounded fair" and "would look into" revising Plaintiff's write-ups, removing infractions related to her disability, such as for a "negative" attitude.

**ANSWER:** Denied.

205.    Ms. Blood also agreed it was "fine" and that she "could not see why that it would not be a possibility" to counsel Plaintiff for errors, instead of Mr. Amoling or Ms. Saster making a list well after the fact and writing her up, while coaching other employees contemporaneously to the error.

**ANSWER:** Defendant admits only that Ms. Blood said it seemed like a reasonable request to counsel Plaintiff in the moment or shortly thereafter with regard to mistakes identified immediately, but otherwise denies the allegations contained in this paragraph.

206.    Ms. Blood said the quiet workspace would be more "difficult" but said she would "talk to" Mr. Amoling and Ms. Saster to try to find one.

**ANSWER:** Admitted.

207.    Plaintiff complained to Ms. Blood, again, about differential treatment regarding her writeup; she complained that she had no "notation of conversation" prior to her first write up which was counter to NETA policy, the actual form, and the practice with other employees.

**ANSWER:** Denied.

208.    Despite yet another report of differential treatment, Ms. Blood did and said nothing.

**ANSWER:** Denied.

209.    Notably, while speaking to Ms. Blood, her phone rang and she proceeded to have an entire conversation in front of Plaintiff about her minor, teenage transgender son's private medical information, transition programs, and the fact that he was suicidal; Plaintiff was uncomfortable.

**ANSWER:** Defendant is without knowledge or information sufficient to admit or deny whether Ms. Blood spoke with her son in this instance, or about the specifics of the call, but admits that Ms. Blood would take her son's calls because his situation often required immediate response.

210.    Ms. Blood got off the phone and then tried discussing, with Plaintiff, her son's suicidal nature and her belief it was due to testosterone; she then asked Plaintiff about her own treatment.

**ANSWER:** Defendant admits that Ms. Blood discussed her son with Plaintiff as Plaintiff had offered to be a resource for him, but Defendant lacks knowledge or information to admit or deny whether this specific conversation occurred.

211.    Plaintiff was extremely uncomfortable discussing her medical experience with Ms. Blood.

**ANSWER:** Defendant is without knowledge or information sufficient to admit or deny the allegations in this paragraph.

212.    Plaintiff attempted to end the meeting and Ms. Blood then requested updated FMLA paperwork from the VA and required Plaintiff's doctor fill out a form justifying each accommodation.

**ANSWER:** Defendant admits that Ms. Blood asked her to complete NETA's ADA request form, but denies the remainder of the allegations in this paragraph.

213.    Plaintiff was given 2 $\frac{1}{2}$ hours to fill out the paperwork, which included dates of diagnoses with PTSD; Plaintiff expressed concern with doing the paperwork without her medical records.

**ANSWER:** Denied.

214.    Ms. Blood stated to just fill out what she could.

**ANSWER:** Defendant denies that Plaintiff was given the timeframe in Paragraph 213, but admits that Ms. Blood asked her to fill out what she could of the paperwork.

215.    When Plaintiff turned in the paperwork less than 3 hours later, when Ms. Blood was leaving that day, the date of disability was left blank by Plaintiff because she was unsure about dates of treatment and the formal diagnosis, but she clearly stated it had been "a while".

**ANSWER:** Denied.

216.   In response, Ms. Blood told Plaintiff to simply "put the date [she] went into the hospital seeing as that is the date associated with my FMLA and all [her] other paperwork for that situation"; thus, Plaintiff listed "I believe [it] was May 6, 2019," as her date of disability with PTSD, per Ms. Blood's express instruction.

**ANSWER:** Denied.

217.   Notably, the doctor's form submitted as part of that paperwork clearly indicates that Plaintiff has had PTSD since her time leaving the military in 2013; specifically, her doctor wrote "this has been present since 2013, it is expected to be chronic, she will always need accommodations."

**ANSWER:** The allegations in this paragraph concern a document which speaks for itself, and Defendant otherwise denies any allegation that suggests that Plaintiff informed Defendant that she had been diagnosed with PTSD in 2013.

218.   Relatedly, soon after that meeting, Plaintiff discussed the quiet workspace with Ms. Saster who said Plaintiff could work in the building across the street or use the vault which were both quiet.

**ANSWER:** Defendant admits only that the building across the street and the vault were considered as options, but were ultimately determined to not be feasible.

219.   Plaintiff informed Ms. Blood of those spaces per Ms. Saster; Plaintiff thought the quite workspace was resolved and was waiting for Ms. Saster to give her the go-ahead to move.

**ANSWER:** Defendant is without information on Plaintiff's thoughts about the quiet workspace issue.

220.    Finally, in that meeting with Ms. Blood, Plaintiff again reported Don's sexual harassment of her.

**ANSWER:** Admitted.

221.    Only after that meeting, on June 26, 2019, was Don given his first warning for the harassment; however, Don's "discipline" was only a first-level corrective action "notation of conversation" for what was blatantly characterized in that notation as "comments about [Plaintiff's] body, hair, etc. [which] violate our Freedom From Harassment policy (pgs 10-12) that states that commenting on an individual's body can be considered sexual harassment."

**ANSWER:** Defendant admits that Don was given a Notation of Conversation on June 26, 2019 which speaks for itself, but denies the remainder of the allegations in this paragraph.

222.    To be clear, Don received a first-level "notation of conversation" for sexually harassing Plaintiff (issued months after repeated reports of the same to managers and HR), while Plaintiff was given a *second-level write-up* for her first ever discipline based on common labeling mistakes.

**ANSWER:** Denied.

223.    The "notation of conversation" did however warn Don to "not speak to Riley unless it is absolutely necessary to complete his job" and noted that Don had been "counseled several times about appropriate conversations and about distracting employees while they are trying to work."

**ANSWER:** The allegations in this paragraph concern a document which speaks for itself.

224.    Additionally, Don was not supposed to come in Plaintiff's workspace at all, as enforced by leads.

**ANSWER:** Denied.

225.   But after this meeting, Don continued to find Plaintiff and harass her including waiting outside the women's locker room when Plaintiff came out, coming into Plaintiff's workspace frequently to do things like empty an already empty garbage and coming to the breakroom when she was there – in front of leads tasked with enforcement, and following Plaintiff around; he continued to do this in front of the leads/supervisors and even managers with no one stopping him despite that guarantee.

**ANSWER:** Denied.

226.   During that time, Don would also frequently cause loud disruptions near Plaintiff, yell across the room to coworkers standing next to her, or intentionally startle her to trigger her PTSD.

**ANSWER:** Denied.

227.   Upon information and belief, Don was retaliating against Plaintiff for her reports about him and his "notation of conversation" discipline.

**ANSWER:** Denied.

228.   Moreover, Ms. Blood began to exhibit more conduct making Plaintiff increasingly uncomfortable.

**ANSWER:** Denied.

229.   For example, Plaintiff was in the locker room changing and a partially-naked Ms. Blood brought up her transgender son's breast development and how her transgender son had the "biggest breasts out of the family," *stated while her shirt was off*; Ms. Blood then motioned to her own bare chest stating "he definitely did not get them from me," while shirtless.

**ANSWER:** Defendant denies that Ms. Blood brought up her transgender son's breast development as Plaintiff was asking Ms. Blood about Ms. Blood's son's transition. Defendant admits that Ms. Blood joked that her son did not get he did not get his breasts from her, but denies the remainder of the allegations contained in this paragraph.

230.    Also during this conversation, Ms. Blood inappropriately shared how she had bought her transgender son his first "binder" for his breasts and asked Plaintiff if there was "stuff like that" for trans women," gesturing to her groin area with her hand.

**ANSWER:** Denied.

231.    Plaintiff was extremely uncomfortable by Ms. Blood's comments.

**ANSWER:** Defendant is without knowledge or information sufficient to admit or deny the allegations in this paragraph.

232.    Then days later in early July of 2019, just outside of work, Ms. Blood announced in front of others that Plaintiff should have "come to her earlier about Don" and "saved us all a bunch of trouble"; she also stated that "Don should have been talked to by his team by then."

**ANSWER:** Denied.

233.    Plaintiff was mortified that Ms. Blood publicly announced she had reported Don's actions.

**ANSWER:** Defendant lacks knowledge or information sufficient to admit or deny the allegations in this paragraph

234.    By mid-July of 2019, Plaintiff had been back at work for over two weeks but she still had no accommodations except she was allowed to wear headphones and have an icepack for stress.

**ANSWER:** Defendant admits that it allowed Plaintiff to wear headphones and use an icepack for stress but denies the remaining allegations contained in this paragraph.

235.    Coworkers *continued* to touch Plaintiff without permission, intentionally startle her, interrupt her, misgender her, deadname her, yell "Wooooo," and harass her to smile; also nothing was done about any of Plaintiff's requested accommodations that Ms. Blood was "looking into."

**ANSWER:** Denied.

236.    With no help from HR, Plaintiff had to start wearing a sticker saying "Please don't sneak up behind me, I have PTSD" to minimize being startled.

**ANSWER:** Defendant admits that Plaintiff started to wear a sticker on her but denies the remaining allegations contained in this paragraph.

237.    Prior to doing it, Plaintiff asked her supervisor Ms. Saster if she could try that method and Ms. Saster had agreed that it was "cool," clearly having no issue with it.

**ANSWER:** Denied.

238.    Notably despite the sign, Plaintiff was still startled by her coworkers, possibly even more, often in front of supervisors/leads.

**ANSWER:** Denied.

239.    Coworkers, and even leads/supervisors, managers, and *Ms. Blood,* would still wave their hands in Plaintiff's face and touch her despite agreement to use the notebook for non-critical issues.

**ANSWER:** Denied.

240.    On that July 11, 2019, Plaintiff met with Ms. Saster and Ms. Blood simply to complain that she still did not have her accommodations and to ask for an update.

**ANSWER**: Defendant is without knowledge or information sufficient to admit or deny the allegations in this paragraph.

241.    Ms. Blood announced that she had "talked to a lawyer" and she did not "have to" change the write-ups to remove disability-related behavior, because there was "nothing wrong" with the write-ups.

**ANSWER:** Defendant admits that Ms. Blood informed Plaintiff that changing the write-ups was unnecessary and inappropriate, but denies the remainder of the allegations in this paragraph.

242.    Ms. Saster added Mr. Amoling "felt" the write-ups had "nothing to do with" Plaintiff's disability.

**ANSWER:** Denied.

243.    Ms. Blood and Ms. Saster ignored all other accommodation requests that were supposed to be in the works and Ms. Blood pivoted to criticizing Plaintiff, stating there were "a lot of problems."

**ANSWER:** Denied.

244.    Then, Ms. Saster turned her computer to show Plaintiff a pre-written list of new wrongs, expressly against one agreed-upon accommodation to counsel Plaintiff at the time like other employees.

**ANSWER:** Defendant admits that they had a list of errors but denies the remainder of the allegations in this paragraph.

245.    Plaintiff asked why the issues had not been brought up at the time of the alleged error.

**ANSWER:** Admitted.

246.    Ms. Saster said they were "getting around to it now" and simply read Plaintiff the four issues.

**ANSWER:** Defendant admits that Ms. Saster discussed the four issues as per the accommodation request made by Ms. Soule to discuss performance issues in a timely manner.

247.   One of the issues was on a project Plaintiff had not worked on.

**ANSWER:** Denied.

248.   Another was due to a change in protocol; Plaintiff made a "mistake" before the change.

**ANSWER:** Denied.

249.   Plaintiff did not understand the other two items.

**ANSWER:** Defendant is unaware that Plaintiff did not understand the other listed items.

250.   After Plaintiff challenged the factual basis of the issues that she understood, Ms. Saster said she would "look into it" but then Ms. Blood stated "there was clearly still a problem."

**ANSWER:** Denied.

251.   Ms. Blood seemed hostile and did not elaborate.

**ANSWER:** Denied.

252.   Plaintiff complained she was still working in the extremely loud lobby two weeks after returning despite her doctors' requests for accommodation and after agreement to move her.

**ANSWER:** Defendant admits that they continued to look for a different location for Ms. Soule but denies that she was working in an "extremely loud lobby."

253.   Ms. Blood's only response was to question "how loud it could be after 6 PM?"

**ANSWER:** Defendant admits that Ms. Blood asked how loud it was after 6 PM, but denies that this was her "only" response.

254.    Plaintiff informed her it was a "madhouse" and that she had a recording; Plaintiff played

the loud recording and Ms. Blood changed the subject once she heard Plaintiff recording.

**ANSWER:** Denied.

255.    Ms. Blood then chastised Plaintiff for the sign Ms. Saster had approved to avoid

interruptions; Ms. Blood called it "hostile and disruptive."

**ANSWER:** Denied.

256.    Plaintiff complained that she had been reporting coworker problems since early 2019,

which contributed to Plaintiff's increased PTSD symptoms, her recent suicidal state, and had

*very recently* resulted in two-months of unpaid leave and inpatient treatment.

**ANSWER:** Defendant admits that Plaintiff made these claims as alleged in this paragraph.

257.    Ms. Blood stated rudely that she "could not do anything about [Plaintiff's] concentration"

and that "[Plaintiff] would have to figure that out on [her] own."

**ANSWER:** Denied.

258.    At the end of the meeting, it was again agreed that Plaintiff could work in the vault and

Ms. Saster offered to get the required software installed so that could occur; Ms. Saster even

offered her credentials to try to get to the software for Plaintiff right away so she could move

sooner.

**ANSWER:** Defendant admits that Ms. Saster offered to obtain Ms. Soule the requisite software

and credentials so that Ms. Soule could work on her laptop in quieter places, but denies that "it

was agreed" that Plaintiff could work in the vault.

259.    Ms. Saster's suggestions did not work and Plaintiff continued to wait for a quiet

workspace.

**ANSWER:** Denied.

260.    The next day, on or about July 12, 2019, Ms. Blood again waived her hands in Plaintiff's face.

**ANSWER:** Denied.

261.    Then, on July 18, 2019, about three weeks since Don was given instructions to stay away from Plaintiff, Plaintiff was working in the lobby area when Don came in vacuuming the area.

**ANSWER:** Admitted.

262.    Again, it was leads and supervisors who were supposed to enforce Don staying away from Plaintiff, however, as Don approached her, lead Mike Viollette was present who allowed Don to engage him in conversation only feet from Plaintiff, without enforcing the rule.

**ANSWER:** Denied.

263.    Plaintiff watched Don see her, reach into his pocket and take out a paperclip, intentionally drop it on the floor under the desk adjacent to her, then intentionally vacuum it up causing issues with the vacuum that he then used as an excuse to plant himself near Plaintiff to "fix" it.

**ANSWER:** Denied.

264.    Don talked to Plaintiff's coworkers while slowly moving toward Plaintiff, making it hard for her to exit without coming closer to him; Don then positioned himself in the path of Plaintiff's exit.

**ANSWER:** Denied.

265.    Plaintiff had a panic attack and went straight to the locker room to calm down.

**ANSWER:** Defendant is without knowledge or information sufficient to admit or deny the allegations in this paragraph.

266.    In video provided by NETA, Don is seen following Plaintiff into the breakroom right as she leaves the work area, waiting for her, then as Plaintiff leaves, Don is seen trying tried to touch her back-end, and then Don continues following Plaintiff down the hallway.

**ANSWER:** Denied.

267.    Plaintiff then went to HR, on video, and is seen having to hold herself up as she walks and visibly shaking due to her panic attack while waiting in HR.

**ANSWER:** The allegations contained in this paragraph concern video evidence that speaks for itself, but deny Plaintiff's characterization of same.

268.    Once at HR, Plaintiff told Ms. Joyce that she was having a panic attack, and Ms. Joyce responded that it was "very evident"; Plaintiff was sent home.

**ANSWER:** Admitted.

269.    A few days later on July 22, 2019, Plaintiff returned to work and was quickly approached by Ms. Blood who took her to her office and asked her about what happened with Don.

**ANSWER:** Admitted.

270.    Plaintiff told her what had happened and Ms. Blood stated she would look into it; in that meeting Ms. Blood also stated that she had talked to Ms. Saster and was "going to push for [Plaintiff] to move to the vault which should have been the plan from the beginning"; it still did not happen.

**ANSWER:** Defendant admits only that working in the vault was an option they continued to consider during this time and admits that Ms. Blood said she would follow up about the vault as

she was unclear at the time whether Plaintiff could work there but denies the remaining

allegations contained in this paragraph

271.    Over the next few work days, Don *continued* to seek Plaintiff out and otherwise make her

very uncomfortable; Don was not written up for these incidents.

**ANSWER:** Denied.

272.    Also after Plaintiff's second brief leave from work, her coworkers continued harassing

her by misgendering and deadnaming her, yelling in her ear, touching her, waiving their hands in

her face, startling her intentionally, and saying "smile."

**ANSWER:** Denied.

273.    As a result, Plaintiff had more panic attacks at work.

**ANSWER:** Defendant is without knowledge or information sufficient to admit or deny the

allegations in this paragraph.

274.    Also, Plaintiff *still* did not have a quiet workspace as agreed a month prior, still did not

have a way for coworkers to not interrupt her as agreed, still did not have a way to not be

touched as agreed, still had not been coached on mistakes as agreed, and Don was still harassing

her.

**ANSWER:** Denied.

275.    Plaintiff felt increasingly upset and unsafe at work and then on July 29, 2019, Plaintiff

expressed to her partner Remi that she was feeling suicidal again; Plaintiff told Remi that she felt

that going back to NETA was "pushing [her] over the edge" and was making her feel as unstable

as in May.

**ANSWER:** Defendant is without knowledge or information sufficient to admit or deny the allegations in this paragraph.

276.    Plaintiff's doctors recommended leave until all of her accommodations had been not just agreed to but implemented and the situation with Don had been permanently resolved.

**ANSWER**: Defendant lacks knowledge or information sufficient to admit or deny what Plaintiff's doctors recommended.

277.    As such, Plaintiff took the remainder of her FMLA leave and requested, via email, on or about August 8, 2019, that her job be held for her, as is required by the FMLA, as an ADA accommodation, past the expiration of her FMLA leave if matters had not yet been resolved; in other words, Plaintiff requested an ADA accommodation to extend FMLA job protection ensuring a substantially similar job would be held for her until NETA implemented the very reasonable accommodations requested *by her doctor*.

**ANSWER:** The allegations in this paragraph contains legal conclusions to which no response is required. To the extent the allegations in this paragraph concern documents, such documents speak for themselves. Defendant otherwise denies Plaintiff's characterizations of such documents and any other factual allegations contained in this paragraph are denied.

278.    NETA granted the accommodation to extend FMLA job protection but again, did not enforce it.

**ANSWER:** Denied.

279.    The other accommodations requested were the same as those discussed months prior, supported by her doctor's written request, and included that:

a.        Plaintiff be provided with a quiet workspace[8];

b.          Coworkers be prevented from needlessly touching or distracting Plaintiff;

c.          Don would be prevented from coming near Plaintiff;

d.          Plaintiff be counseled when she made mistakes, not provided a list much later;

e.          The disability-related comments be removed from Plaintiff's write-ups; and

f.          Plaintiff would be allowed the as-needed use of an icepack and headphones

**ANSWER:** The allegations contained in this paragraph concern a document which speak for themselves.

280.    Remi and Plaintiff communicated with Ms. Blood for the entirety of her remaining FMLA leave and beyond, from July 29, 2019 through her September 27, 2019 constructive discharge.

**ANSWER:** Defendant admits that Remi Soule and/or Plaintiff communicated with Ms. Blood during this time frame but deny all remaining allegations in this paragraph.

281.    Ms. Blood never provided a straight answer on Plaintiff's doctor-requested accommodations; in other words, not only did she not implement these accommodations, she did not agree to them despite most having already been agreed to verbally in June of 2019.

**ANSWER:** Denied.

282.    In fact, for over a month, Plaintiff and Remi wrote about 13 emails (22 pages) asking for clarification on what accommodations NETA would commit to.

**ANSWER:** Defendant admits that Plaintiff/Remi engaged in email communications with NETA during this time which communications speak for themselves but otherwise denies Plaintiff's characterization of such documents.

283.    In response, Ms. Blood wrote about 14 emails (15 pages) yet never approved the doctor-requested accommodation, and at times, expressly revoked accommodations previously agreed to.

**ANSWER:** Defendant admits that Ms. Blood engaged in email communications with Plaintiff and Remi Soule which speak for themselves but otherwise denies the remaining allegations in this paragraph.

284.    Plaintiff had been planning to return to work at the end of August of 2019, however as that date neared, Plaintiff still had no approved accommodations.

**ANSWER:** Denied.

285.    Additionally, NETA put up barriers to Plaintiff getting her accommodations worked out.

**ANSWER:** Denied.

286.    For example, NETA required that Remi sign an authorization form, which had never been required before allowing her to speak for Riley at times that Riley needed that help.

**ANSWER:** Defendant admits that it required an authorization form to speak with Remi in detail, but denies the remainder of the allegations in this paragraph.

287.    Then, nearly a month after Remi had promptly returned the authorization form, specifically on August 26, 2019, Remi emailed Ms. Blood to reminder her that she had long-since sent the authorization "weeks ago and have not heard anything."

**ANSWER:** To the extent the allegations in this paragraph concern documents, such documents speak for themselves. Defendant otherwise denies Plaintiff's characterizations of such documents and any other factual allegations contained in this paragraph.

288.    In that email, Remi requested information about Plaintiff's quiet workspaces, her move to either the vault or across the street, as well as requested updates on how NETA would prevent

coworkers from touching and surprising Plaintiff upon her return, as NETA had previously failed at this.

**ANSWER:** To the extent the allegations in this paragraph concern documents, such documents speak for themselves. Defendant otherwise denies Plaintiff's characterizations of such documents and any other factual allegations contained in this paragraph.

289.   However, on August 28, 2019, instead of updating Remi on the accommodations, Ms. Blood stated that Plaintiff's job was no longer available; but was offered a "new" job that was not substantially similar to her old job, as required by FMLA, due to a significant start and end time change.

**ANSWER:** To the extent the allegations in this paragraph concern documents, such documents speak for themselves. Defendant otherwise denies Plaintiff's characterizations of such documents and any other factual allegations contained in this paragraph.

290.   The job hours for this "new job" changed from Plaintiff's normal shift of 2:30 PM to 11:00 PM to start and end times of 5:30 PM and 2:00 AM.

**ANSWER:** Admitted.

291.   Not only was this a significant change in work hours, it interfered with her medication schedule.

**ANSWER:** Defendant denies that a three hour change is a "significant change." Further, Defendant denies having knowledge of her medication schedule at the time. Defendant is without knowledge or information sufficient to admit or deny whether such change in schedule would have interfered with her medication schedule.

292.   Moreover, the location of the "new job" was a notably *louder* location than before.

**ANSWER:** Denied.

293.    As such, on August 29, 2019, Plaintiff requested an additional accommodation; she requested to work in her "new" job the normal shift times; Plaintiff stated that her job had not been held and instead had been "drastically changed."

**ANSWER:** To the extent the allegations in this paragraph concern documents, such documents speak for themselves. Defendant otherwise denies Plaintiff's characterizations of such documents and any other factual allegations contained in this paragraph.

294.    Moreover, Ms. Blood was informed that the new shift would "interfere with [her] medications schedule and would be difficult for [her] due to [her] disability"; thus she requested a reasonable accommodation of shift hours from 2:30 to 11:00 P.M. and if that was not possible, she requested that she "be given one of the 1st/day shift positions" which had been given to others in the past outside of seniority or other work-related bases.

**ANSWER:** To the extent the allegations in this paragraph concern documents, such documents speak for themselves. Defendant otherwise denies Plaintiff's characterizations of such documents and any other factual allegations contained in this paragraph.

295.    On August 30, 2019, Ms. Blood responded that all prior accommodations were "no longer available due to the restructuring of the department."

**ANSWER:** To the extent the allegations in this paragraph concern documents, such documents speak for themselves. Defendant otherwise denies Plaintiff's characterizations of such documents and any other factual allegations contained in this paragraph.

296.    Further Ms. Blood summarily denied Plaintiff moving to the 1st shift because "we have a full morning roster" but stated she would "see if it is possible" to change Plaintiff's shift hours; this request was never granted even after *a month of emails*.

**ANSWER:** To the extent the allegations in this paragraph concern documents, such documents speak for themselves. Defendant otherwise denies Plaintiff's characterizations of such documents and any other factual allegations contained in this paragraph.

298.    Plaintiff notified Ms. Blood that she could not return, per her treatment providers', until she had an agreement on accommodations because "last time [Plaintiff] returned to work under the impression that [they] would work on the solutions [] absolutely nothing was worked on or solved." Despite Plaintiff and Remi's 13 emails (22 pages) and Ms. Blood's 14 emails (15 pages), Ms. Blood never agreed to any accommodations after they were rescinded "due to the restructuring."

**ANSWER:** To the extent the allegations in this paragraph concern documents, such documents speak for themselves. Defendant otherwise deny Plaintiff's characterizations of such documents and any other factual allegations contained in this paragraph.

299.    For example, on August 29, 2019, Plaintiff reminded Ms. Blood that her doctor faxed the documentation demonstrating the need for accommodations including a quiet workspace on August 8, 2019 and yet nothing was agreed by NETA.

**ANSWER:** To the extent the allegations in this paragraph concern documents, such documents speak for themselves. Defendant otherwise denies Plaintiff's characterizations of such documents and any other factual allegations contained in this paragraph.

300.    On August 30, 2019, Ms. Blood responded trying to convince Plaintiff that the new

workspace – the lab/kitchen – was "much quieter and less hectic"; other options could be

"discuss[ed]" later.

**ANSWER:** To the extent the allegations in this paragraph concern documents, such documents

speak for themselves. Defendant otherwise denies Plaintiff's characterizations of such

documents and any other factual allegations contained in this paragraph.

301.    On September 5, 2019, Plaintiff complained that the vault or across the street had been

"approved since the end of June and [she] was only waiting on a timeline" which was "rescinded

now."

**ANSWER:** To the extent the allegations in this paragraph concern documents, such documents

speak for themselves. Defendant otherwise denies Plaintiff's characterizations of such

documents and any other factual allegations contained in this paragraph.

302.    Plaintiff further complained that the lab/kitchen was not "much quieter and less hectic";

she relayed that there were more employees in that area, that the lab/kitchen was an "enclosed

space that amplifies sound," that employees play music on the speakers there, and that it was

"tight" quarters where she would be touched more against her doctor's requested accommodation.

**ANSWER:** To the extent the allegations in this paragraph concern documents, such documents

speak for themselves. Defendant otherwise denies Plaintiff's characterizations of such

documents and any other factual allegations contained in this paragraph.

303.    Similarly, on September 8, 2019, Plaintiff complained that workspace agreements were

rescinded.

**ANSWER:** To the extent the allegations in this paragraph concern documents, such documents speak for themselves. Defendant otherwise denies Plaintiff's characterizations of such documents and any other factual allegations contained in this paragraph.

304.     On September 11, 2019, Ms. Blood responded and denied "rescinding" Plaintiff's accommodations to work in the vault or across the street; according to her, since Plaintiff's job had been changed and the "new role requires [her] to be accessible to multiple people," Plaintiff could no longer be accommodated with the quiet workspaces despite her doctor's request.

**ANSWER:** To the extent the allegations in this paragraph concern documents, such documents speak for themselves. Defendant otherwise denies Plaintiff's characterizations of such documents and any other factual allegations contained in this paragraph.

305.     Importantly, Ms. Blood claim that Plaintiff's new job was different was false; a side-by-side comparison of the old and new job descriptions shows they were nearly identical.

**ANSWER:** Denied.

306.     Further, Ms. Blood stated that Plaintiff's requested accommodation of a quiet workspace had been "addressed" by the future promise of "attempting to find a quiet workspace."

**ANSWER:** To the extent the allegations in this paragraph concern documents, such documents speak for themselves. Defendant otherwise denies Plaintiff's characterizations of such documents and any other factual allegations contained in this paragraph.

307.     A future promise to "attempt" or "discuss" something is not a reasonable accommodation.

**ANSWER:** This paragraph contains legal conclusions to which an answer is not required.

308.    On September 17, 2019, Plaintiff pointed out that Ms. Blood had not responded to her concerns about workspace in the lab/kitchen, suggested she could work in the vault or across the street and use a walky-talky or internal phone system, and raised concerns about relying on a future promise of a quite workspace since this had proved unreliable the last time she returned from FMLA.

**ANSWER:** To the extent the allegations in this paragraph concern documents, such documents speak for themselves. Defendant otherwise denies Plaintiff's characterizations of such documents and any other factual allegations contained in this paragraph.

309.    On September 20, 2019, Ms. Blood failed to substantively address any of Plaintiff's concerns, simply repeating the list of "accommodations" and vague future promises, then concluded that "we need a note from your provider that supports these requests" despite already having the proof of need for these accommodations from her doctor returned to NETA on August 8, 2019.

**ANSWER:** To the extent the allegations in this paragraph concern documents, such documents speak for themselves. Defendant otherwise denies Plaintiff's characterizations of such documents and any other factual allegations contained in this paragraph.

310.    Ms. Blood handled Plaintiff's request to not be needlessly touched, distracted, or startled by coworkers no better; Ms. Blood's August 30, 2019 email vaguely promised that "we reinforced with the team, through the team leaders and supervisors, the need to not startle or surprise you and are happy to continue to do so."

**ANSWER:** To the extent the allegations in this paragraph concern documents, such documents speak for themselves. Defendant otherwise denies Plaintiff's characterizations of such documents and any other factual allegations contained in this paragraph.

311.   Ms. Blood however also admitted this same email that such reinforcement had failed the first time; she admitted in that email that "on several occasions your co-workers poked you in jest."

**ANSWER:** To the extent the allegations in this paragraph concern documents, such documents speak for themselves. Defendant otherwise denies Plaintiff's characterizations of such documents and any other factual allegations contained in this paragraph.

313.   On September 8, 2019, Plaintiff complained that "often with [Plaintiff's] team leads witness[ed] it" as coworkers were touching her.

**ANSWER:** To the extent the allegations in this paragraph concern documents, such documents speak for themselves. Defendant otherwise denies Plaintiff's characterizations of such documents and any other factual allegations contained in this paragraph.

314.   Ms. Blood responded only that the "[e]xpectation of never being 'touched' at work is not realistic..." and "nor is all touching in the workplace inappropriate or surprising."

**ANSWER:** To the extent the allegations in this paragraph concern documents, such documents speak for themselves. Defendant otherwise denies Plaintiff's characterizations of such documents and any other factual allegations contained in this paragraph.

315.   Ms. Blood's statement was in direct contradiction to previous statements that not being touched was "completely reasonable," it was "standard in the workplace," and there "is no reason anyone at NETA should be touching anyone else because it is not part of any's job duties."

**ANSWER:** To the extent the allegations in this paragraph concern documents, such documents speak for themselves. Defendant otherwise denies Plaintiff's characterizations of such documents and any other factual allegations contained in this paragraph.

316.   Ms. Blood's emails promised only future efforts that had already failed, such as "[i]nstructions not to touch [Plaintiff]," rather than any actual accommodation.

**ANSWER:** To the extent the allegations in this paragraph concern documents, such documents speak for themselves. Defendant otherwise denies Plaintiff's characterizations of such documents and any other factual allegations contained in this paragraph.

317.   In her constructive termination email on September 27, 2019, Plaintiff explained she could not trust future promises in lieu of accommodations: "When I returned 6/24/19 [] I was promised I wouldn't be touched, snuck up on, interruptions would be limited and streamlined, that I would be moved to a quieter workspace" but that no promise was followed through on.

**ANSWER:** To the extent the allegations in this paragraph concern documents, such documents speak for themselves. Defendant otherwise denies Plaintiff's characterizations of such documents and any other factual allegations contained in this paragraph.

318.   Ms. Blood handled Don's harassment even worse; on August 30, 2019, Ms. Blood's email not only denied that Plaintiff had ever reported harassment, but she justified Don's behavior.

**ANSWER:** To the extent the allegations in this paragraph concern documents, such documents speak for themselves. Defendant otherwise denies Plaintiff's characterizations of such documents and any other factual allegations contained in this paragraph.

319.   Specifically, Ms. Blood stated that the event with Don and the vacuum on July 18, 2019, as not "in any way [] sexual, or even somehow inappropriate"; Plaintiff had not claimed it was sexual.

**ANSWER:** To the extent the allegations in this paragraph concern documents, such documents speak for themselves. Defendant otherwise denies Plaintiff's characterizations of such documents and any other factual allegations contained in this paragraph.

320.   Further, Ms. Blood shockingly admitted in email that "Don may have made some statements that may not have been entirely appropriate," but that he "may have made some this [sic] comments due to his lack of self-awareness, which is pretty obvious ..." and that his comments should be excused due to his "obvious" "lack of self-awareness."

**ANSWER:** To the extent the allegations in this paragraph concern documents, such documents speak for themselves. Defendant otherwise denies Plaintiff's characterizations of such documents and any other factual allegations contained in this paragraph.

321.   Notably, Ms. Blood had stated, in May, that Don's conduct was inappropriate and was "dealt with"; this was repeated on June 24, 2019.

**ANSWER:** To the extent the allegations in this paragraph concern documents, such documents speak for themselves. Defendant otherwise denies Plaintiff's characterizations of such documents and any other factual allegations contained in this paragraph.

322.   On September 5, 2019, Plaintiff reminded Ms. Blood that she had been reporting Don's sexual harassment since it started and nothing effective had been done to stop him.

**ANSWER:** To the extent the allegations in this paragraph concern documents, such documents speak for themselves. Defendant otherwise denies Plaintiff's characterizations of such documents and any other factual allegations contained in this paragraph.

323.    On September 11, 2019, Ms. Blood stated NETA agreed to provide "instructions to Don to not talk to [Plaintiff] on any non-work-related matters" which was already in place *prior* to the day with the vacuum incident occurred and Don followed Plaintiff around NETA on video.

**ANSWER**: To the extent the allegations in this paragraph concern documents, such documents speak for themselves. Defendant otherwise denies Plaintiff's characterizations of such documents and any other factual allegations contained in this paragraph.

324.    Ms. Blood then concluded, despite the notation of conversation calling Don's earlier acts towards Plaintiff sexual harassment in violation of policy, that while Don's comments were "perhaps 'less than appropriate'" they were "far from sufficiently severe or pervasive to be sexual harassment."

**ANSWER:** To the extent the allegations in this paragraph concern documents, such documents speak for themselves. Defendant otherwise denies Plaintiff's characterizations of such documents and any other factual allegations contained in this paragraph.

325.    Further, Ms. Blood justified these statements and Don's "lack of awareness" as her "trying to convey that he lacks self-awareness that might have avoided the issues if he were more self-aware," rather than provide solutions for Don's inappropriate conduct towards Plaintiff.

**ANSWER:** To the extent the allegations in this paragraph concern documents, such documents speak for themselves. Defendant otherwise denies Plaintiff's characterizations of such documents and any other factual allegations contained in this paragraph.

326.   Ms. Blood, while discussing Plaintiff's return to work, again mischaracterized Don's final intimidating event with the vacuum as benign because in "order for behavior to constitute sexual harassment, it needs to have some sexual overtone to it and vacuuming the floor plainly was not."

**ANSWER:** To the extent the allegations in this paragraph concern documents, such documents speak for themselves. Defendant otherwise denies Plaintiff's characterizations of such documents and any other factual allegations contained in this paragraph.

327.   To be clear, Plaintiff never claimed that event was sexual harassment – she claimed it was intimidation in retaliation for Plaintiff's complaints about Don and Don's notation of conversation.

**ANSWER**: Denied.

328.   On September 20, 2019, Ms. Blood represented that NETA would only agree to "[i]nstructions to Don to not talk to [Plaintiff] on any non-work-related matters" and left open if Don could still enter Plaintiff's work area, follow her, and wait for her outside of the bathroom.

**ANSWER**: To the extent the allegations in this paragraph concern documents, such documents speak for themselves. Defendant otherwise denies Plaintiff's characterizations of such documents and any other factual allegations contained in this paragraph.

329.   In her constructive discharge email on September 27, 2019, Plaintiff responded that allowing Don to be near her was unreasonable because Don had "exhibited an intentional desire to harass [her] and now intimidate [her]" after Plaintiff had reported him and he was written up.

**ANSWER:** To the extent the allegations in this paragraph concern documents, such documents speak for themselves. Defendant otherwise denies Plaintiff's characterizations of such documents and any other factual allegations contained in this paragraph.

330.    Due to the aforesaid reasons, on that day, September 27, 2019, Plaintiff was constructively discharged due NETA's utter inability to provide any accommodations required by her doctor and express (in email) refusal to remedy reported and documented sexual harassment and retaliation.

**ANSWER:** Denied.

331.    Plaintiff was also denied her FMLA right to a substantially similar job after leave and NETA failed to accommodate Plaintiff's by allowing her to go back to her old shift or work the 1st shift.

**ANSWER:** Denied.

332.    In that vein, NETA discharged Plaintiff by not retaining a substantially similar job for Plaintiff.

**ANSWER:** Denied.

333.    As a direct and proximate result of NETA's harassing, discriminatory, and retaliatory actions and omissions, which are in violation of federal and state law, Plaintiff suffered loss of income, loss of earning potential, and loss of a variety of work-related benefits; she experienced humiliation and loss of standing in the community; she suffered and continues to suffer from extreme emotional distress and mental anguish resulting in physical injury; she suffered the extreme medical expenses due directly and proximately from the harassment, discrimination, and retaliation at NETA; she suffered months of missed work without pay due to unpaid leave for the same reason; and suffered other injuries. All damages continue to date.

**ANSWER:** Denied.

## COUNT ONE

334.    ALL Paragraphs are hereby incorporated by reference in their entirety as if fully stated herein.

**ANSWER:** Defendant repeats and incorporates by reference its responses to all paragraphs above as though fully set forth herein.

335.    Plaintiff is a qualified person with a disability.

**ANSWER:** This paragraph contains legal conclusions to which a response is not required.

336.    Plaintiff's PTSD and associated manifestations including anxiety and depression, qualify as a disability under ADA and 151B.

**ANSWER:** Defendant lacks knowledge or information sufficient to admit or deny the allegations contained in this paragraph.

337.    These mental conditions substantially impairs one or more major life function including but not exclusive to memory, concentration, and coping with stress.

**ANSWER:** Defendant lacks knowledge or information sufficient to admit or deny whether Plaintiff's claimed mental conditions impacted her in the manner alleged.

338.    Regardless, at all times relevant, Plaintiff was able to perform the necessary job functions with or without accommodation.

**ANSWER:** Denied.

339.    Therefore, Plaintiff was protected from harassment, discrimination and termination because of disability under the ADA and 151B.

**ANSWER:** Denied.

340.    Plaintiff was subjected to harassment and discrimination by Defendant's agents because of her disability based on the aforesaid conduct.

**ANSWER:** Denied.

341.    Specifically, the aforesaid conduct demonstrates that Plaintiff was subjected to discrimination by Defendant's agents when they repeatedly failed to reasonably accommodate her disability.

**ANSWER:** Denied.

342.    Plaintiff was subjected to a harassment through a hostile work environment that changed the terms and conditions of employment due to disability-based harassment and disparate treatment.

**ANSWER:** Denied.

343.    Plaintiff's manager and supervisor, as well as HR, also subject her to disparate treatment not bestowed upon similarly-situated non-disabled coworkers.

**ANSWER:** Denied.

344.    Defendant knew of this hostile work environment and the unlawful disparate treatment discrimination due to Plaintiff's reports to supervisors, managers, NETA leadership including Mr. Ovelman and HR.

**ANSWER:** Denied.

345.    Despite knowledge, Defendant's agents all failed to remedy the harassment and discrimination.

**ANSWER:** Denied.

346.    But for Defendant's agents' discriminatory conduct, Plaintiff would not have been constructively terminated; no reasonable person in Plaintiff's circumstances could have remained in that environment without remedy from harassment, retaliation, and without doctor-required reasonable accommodations.

**ANSWER:** Denied.

347.    But for Defendant's agents' discriminatory conduct, Plaintiff would not have been terminated by Defendant failing to maintain a substantially similar job as required by the ADA accommodation extending FMLA.

**ANSWER:** Denied.

348.    Defendant's agents' discriminatory conduct, policies, and practices were intentionally discriminatory, motivated by animus, impermissible and unlawful considerations, which violate, *inter alia*, ADA and 151B.

**ANSWER:** Denied.

349.    Plaintiff experienced the damages aforesaid as a proximate result of Defendant's agents' intentional conduct.

**ANSWER:** Denied.

350.    Because Defendant's conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

**ANSWER:** Denied.

351.    Defendant is vicariously responsible for the acts and omissions of its agents under Respondeat Superior.

**ANSWER:** Denied.

## COUNT TWO

352.    ALL Paragraphs are hereby incorporated by reference in their entirety as if fully stated herein.

Defendant repeats and incorporates by reference its responses to all paragraphs above as though fully set forth herein.

353.    Plaintiff was protected from retaliation for reporting disability-based harassment and discrimination under ADA and 151B.

**ANSWER:** This paragraph contains legal conclusions to which no answer is required. To the extent this paragraph makes factual allegations they are denied.

354.    Plaintiff engaged in protected conduct, opposed unlawful conduct, and exercised her rights under ADA and 151B, by reporting harassment and discriminatory treatment because of a protected class to supervisors, managers, and HR for the Defendant.

**ANSWER:** Denied.

355.    As a result of Plaintiff's protected activity, Plaintiff was subjected to disparate treatment and harassment which changed the terms and conditions of her employment in the ways stated above.

**ANSWER:** Denied.

356.    Defendant's agents knew of the retaliatory conduct but failed to take swift, remedial action to remedy it in violation of, *inter alia*, ADA and 151B.

**ANSWER:** Denied.

357.    But for Defendant's agents' retaliatory conduct, Plaintiff would not have been constructively terminated; no reasonable person in Plaintiff's circumstances could have remained in that environment without remedy from harassment, retaliation, and without doctor-required reasonable accommodations.

**ANSWER:** Denied.

358.     But for Defendant's agents' retaliatory conduct, Plaintiff would not have been terminated by Defendant failing to maintain a substantially similar job as required by the ADA accommodation extending FMLA.

**ANSWER:** Denied.

359.     Defendant's agents' retaliatory conduct, policies, and practices were intentionally retaliatory, motivated by animus, impermissible and unlawful considerations, which violate, *inter alia*, ADA and 151B.

**ANSWER:** Denied

360.     Plaintiff experienced the damages aforesaid as a proximate result of Defendant's agents' intentional conduct.

**ANSWER:** Denied.

361.     Because Defendant's conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

**ANSWER:** Denied.

362.     Defendant is vicariously responsible for the acts and omissions of its agents under Respondeat Superior.

**ANSWER:** Denied.

## COUNT THREE

363.     Plaintiff incorporates by reference ALL paragraphs above as if fully set forth herein.

**ANSWER:** Defendant repeats and incorporates by reference its responses to all paragraphs above as though fully set forth herein.

364.    Plaintiff is afforded protections from discrimination and harassment on the basis of gender- identity under Title VII and 151B.

**ANSWER:** This paragraph contains legal conclusions to which no answer is required.

365.    Defendant's agent subjected Plaintiff to harassment and disparate treatment because of gender-identity which changed the terms and conditions of her employment in the ways stated above.

**ANSWER:** Denied.

366.    Defendant's agent knew of the harassment and disparate treatment, but failed to take swift, remedial action to remedy it in violation of, *inter alia*, Title VII and 151B.

**ANSWER:** Denied.

367.    But for Defendant's agents' discriminatory conduct, Plaintiff would not have been constructively terminated; no reasonable person in Plaintiff's circumstances could have remained in that environment without remedy from harassment, retaliation, and without doctor-required reasonable accommodations.

**ANSWER:** Denied.

368.    But for Defendant's agents' discriminatory conduct, Plaintiff would not have been terminated by Defendant failing to maintain a substantially similar job as required by the ADA accommodation extending FMLA.

**ANSWER:** Denied.

369.    Defendant's agents' discriminatory conduct, policies, and practices were intentionally discriminatory, motivated by animus, impermissible and unlawful considerations, which violate, *inter alia*, Title VII and 151B.

**ANSWER:** Denied.

370.    Plaintiff experienced the damages aforesaid as a proximate result of Defendant's agents' intentional conduct.

**ANSWER:** Denied.

371.    Because Defendant's conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

**ANSWER:** Denied.

372.    Defendant is vicariously responsible for the acts and omissions of its agents under Respondeat Superior.

**ANSWER:** Denied.

## COUNT FOUR

373.    Plaintiff incorporates by reference ALL paragraphs above as if fully set forth herein.

**ANSWER:** Defendant repeats and incorporates by reference its responses to all paragraphs above as though fully set forth herein.

374.    Plaintiff is afforded protections from discrimination and harassment on the basis of sex or gender under Title VII and 151B.

**ANSWER:** This paragraph contains legal conclusions to which no answer is required.

375.    Defendant's agent subjected Plaintiff to harassment and disparate treatment because of sex which changed the terms and conditions of her employment in the ways stated above.

**ANSWER:** Denied.

376.   Defendant's agent knew of the harassment and disparate treatment, but failed to take swift, remedial action to remedy it in violation of, *inter alia*, Title VII and 151B.

**ANSWER:** Denied.

377.   But for Defendant's agents' discriminatory conduct, Plaintiff would not have been constructively terminated; no reasonable person in Plaintiff's circumstances could have remained in that environment without remedy from harassment, retaliation, and without doctor-required reasonable accommodations.

**ANSWER:** Denied.

378.   But for Defendant's agents' discriminatory conduct, Plaintiff would not have been terminated by Defendant failing to maintain a substantially similar job as required by the ADA accommodation extending FMLA.

**ANSWER:** Denied.

379.   Defendant's agents' discriminatory conduct, policies, and practices were intentionally discriminatory, motivated by animus, impermissible and unlawful considerations, which violate, *inter alia*, Title VII and 151B.

**ANSWER:** Denied.

380.   Plaintiff experienced the damages aforesaid as a proximate result of Defendant's agents' intentional conduct.

**ANSWER:** Denied.

381.   Because Defendant's conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

**ANSWER:** Denied.

382.    Defendant is vicariously responsible for the acts and omissions of its agents under Respondeat Superior.

**ANSWER:** Denied.


## COUNT FIVE

383.    Plaintiff incorporates by reference ALL paragraphs above as if fully set forth herein.

**ANSWER:** Defendant repeats and incorporates by reference its responses to all paragraphs above as though fully set forth herein.

384.    Plaintiff was protected from retaliatory harassment, discrimination, and termination as a result of engaging in protected conduct under Title VII and 151B.

**ANSWER:** Denied.

385.    Plaintiff engaged in protected conduct, opposed unlawful conduct, and exercised her rights under the Title VII and 151B, by reporting harassing and discriminatory treatment because of a protected class to supervisors, managers, and HR for the Defendant.

**ANSWER:** Denied.

386.    As a result of Plaintiff's protected activity, Plaintiff was subjected to disparate treatment which changed the terms and conditions of her employment in the ways stated above.

**ANSWER:** Denied.

387.    Defendant's agents knew of the retaliatory conduct but failed to take swift, remedial action to remedy it in violation of, *inter alia*, Title VII and 151B.

**ANSWER:** Denied.

388.     But for Defendant's agents' retaliatory conduct, Plaintiff would not have been constructively terminated; no reasonable person in Plaintiff's circumstances could have remained in that environment without remedy from harassment, retaliation, and without doctor-required reasonable accommodations.

**ANSWER:** Denied.

389.     But for Defendant's agents' retaliatory conduct, Plaintiff would not have been terminated by Defendant failing to maintain a substantially similar job as required by the ADA accommodation extending FMLA.

**ANSWER:** Denied.

390.     Defendant's agents' retaliatory conduct, policies, and practices were intentionally retaliatory, motivated by animus, impermissible and unlawful considerations, which violate, *inter alia*, Title VII and 151B.

**ANSWER:** Denied.

391.     Plaintiff experienced the damages aforesaid as a proximate result of Defendant's agents' intentional conduct.

**ANSWER:** Denied.

392.     Because Defendant's conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

**ANSWER:** Denied.

393.     Defendant is vicariously responsible for the acts and omissions of its agents under Respondeat Superior.

**ANSWER:** Denied.

## COUNT SIX

394.    ALL Paragraphs are hereby incorporated by reference in their entirety as if fully stated herein.

**ANSWER:** Defendant repeats and incorporates by reference its responses to all paragraphs above as though fully set forth herein.

395.    Plaintiff was eligible for FMLA; she worked for NETA for more than twelve (12) months and was employed for at least 1,250 hours preceding the desired leave in or about late July 2019.

**ANSWER:** Defendant admits that Plaintiff worked for NETA for more than twelve months and worked for at least 1,250 hours during the 12 month period preceding July 2019, but states the remaining allegations in this paragraph state conclusions of law to which no response is required.

396.    Defendant was a covered entity and employer, as defined by FMLA through Plaintiff's termination in October 2019.

**ANSWER:** The allegations in this paragraph state conclusions of law to which no response is required.

397.    Plaintiff had a qualifying medical condition as of May 2019.

**ANSWER:** The allegations in this paragraph state conclusions of law to which no response is required.

398.    As alleged above, Plaintiff was protected from interference with her rights under FMLA, as well as protected from retaliation under the FMLA for exercising her rights.

**ANSWER:** The allegations in this paragraph state conclusions of law to which no response is required. Plaintiff was retaliated against for taking FMLA, as described above, violating *inter alia*, the FMLA.

**ANSWER:** Denied.

399.    Defendant interfered with Plaintiff's FMLA rights, violating *inter alia*, the FMLA in the ways stated above.

**ANSWER:** Denied.

400.    But for Defendant's agents' interference and retaliatory conduct, Plaintiff would not have been constructively terminated; no reasonable person in Plaintiff's circumstances could have remained in that environment without remedy from harassment, retaliation, and without doctor-required reasonable accommodations.

**ANSWER:** Denied.

402.    But for Defendant's agents' interference and retaliatory conduct, Plaintiff would not have been terminated by Defendant failing to maintain a substantially similar job as required by the ADA accommodation extending FMLA.

**ANSWER:** Denied.

403.    Defendant's agents' retaliatory conduct, policies, and practices were intentionally retaliatory, motivated by animus, impermissible and unlawful considerations, which violate, *inter alia*, FMLA.

**ANSWER:** Denied.

404.    Plaintiff experienced the damages aforesaid as a proximate result of Defendant's agents' intentional conduct.

**ANSWER:** Denied.

405.    Because Defendant's conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

**ANSWER:** Denied.

406.   Defendant is vicariously responsible for the acts and omissions of its agents under Respondeat Superior.

**ANSWER:** Denied.

## COUNT SEVEN

407.   ALL Paragraphs are hereby incorporated by reference in their entirety as if fully stated herein.

**ANSWER**: Defendant repeats and incorporates by reference its responses to all paragraphs above as though fully set forth herein.

408.   Massachusetts recognizes a legal claim for publication of private facts based on Mass. Gen. Laws ch. 214, § 1B, which proscribes "unreasonable, substantial or serious interference" with one's privacy.

**ANSWER:** This paragraph contains a legal conclusion to which no answer is required.

409.  After agreement to not do so, NETA and its agents published Plaintiff's personal and private information related to her gender change and medical information to managers, who in turn were directed by NETA to share it with all employees, without the authorization of Plaintiff.

**ANSWER:** Denied.

 410.   The information published was of a highly personal or intimate nature and was of no business of the public, thereby making the publication offensive to a reasonable person.

**ANSWER**: Denied.

411. The information published was not newsworthy.

**ANSWER:** Denied.

412. Plaintiff did not consent to the publication of her gender change without her presence and involvement in such a disclosure contrary to how it was done.

**ANSWER:** Denied.

413. Plaintiff did not consent to the publication of her personal medical information, such as that she was on hormone replacement therapy, under any condition or circumstance.

**ANSWER:** Denied.

414. The publication was made to more than one or two persons; it was made to the entire company.

**ANSWER:** Denied.

415. Plaintiff was damaged as a proximate result of Defendant's and its agents' intentional conduct in that she was humiliated and experienced extreme emotional distress resulting in physical injury.

**ANSWER:** Denied.

416. Defendant is responsible for its agents' acts and omissions under the theory of *respondeat superior*.

**ANSWER:** Denied.

## <u>General Denial</u>

To the extent not expressly admitted herein, Defendant denies each and every allegation contained in the Amended Complaint.

## <u>AFFIRMATIVE AND OTHER DEFENSES</u>

Defendant asserts the following affirmative and other defenses without assuming any burdens of production, persuasion, or proof that, pursuant to law, are not legally assigned to Defendant and are Plaintiff's burden to prove. Defendant expressly reserves the right to assert any additional affirmative or other defenses that may later come to light as a result of discovery and/or to amend this Answer to assert any such defenses.

### *First Defense*

Plaintiff's claims are barred, in whole or in part, because they fail to state a claim upon which relief may be granted.

### *Second Defense*

If Plaintiff suffered any damages, which Defendant expressly denies, such damages were caused by the conduct of others, including, without limitation, Plaintiff herself, for whose conduct Defendant is not responsible.

### *Third Defense*

Plaintiff's claim is barred, in whole or in part, because any damages Plaintiff may have suffered were not proximately caused by any acts or omissions of Defendant.

### *Fourth Defense*

Plaintiff's claims are barred, in whole or in part, or damages, if any, are reduced for failure to mitigate damages.

### *Fifth Defense*

Plaintiff's claims are barred, in whole or in part, by the doctrines of release, estoppel, laches, unclean hands, and/or waiver.

*Sixth Defense*

Plaintiff's claims are barred, in whole or in part, because she cannot establish a basis for liability against Defendant.

*Seventh Defense*

Plaintiff's claims are not actionable because the challenged employment practices are justified by legitimate, non-discriminatory, and non-pretextual business reasons unrelated to disability, alleged protected conduct or gender identity.

*Eighth Defense*

Although Defendant denies that Plaintiff was exposed to discrimination or retaliation, Defendant exercised reasonable care to prevent and correct promptly any discriminatory or retaliatory behavior, and Plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by Defendant or to otherwise avoid harm.

*Ninth Defense*

Defendant cannot be vicariously liable for punitive damages in light of its good faith efforts to comply with the anti-discrimination and anti-retaliation statutes at issue in this case.

*Tenth Defense*

Plaintiff's claims are barred, in whole or in part, due to the applicable statutes of limitation.

WHEREFORE, Defendant respectfully requests that this Court dismiss all claims of Plaintiff's Amended Complaint, deny Plaintiff's requested relief and any relief whatsoever, enter judgment in favor of Defendant, and award Defendant its costs, reasonable attorneys' fees, and such other relief as this Court deems just and proper.

Respectfully submitted,

NEW ENGLAND TREATMENT ACCESS, LLC

By its attorneys,

/s/ Mark H. Burak
Mark H. Burak (BBO #558805)
Anna Rao (BBO #703843)
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
One Boston Place, Suite 3500
Boston, MA 02108
Telephone: (617) 994-5700
Facsimile: (617) 994-5701
mark.burak@ogletree.com
anna.rao@ogletree.com

Dated: October 13, 2020

## CERTIFICATE OF SERVICE

I hereby certify that on October 13, 2020, this document, filed through the ECF system,

will be sent electronically to the registered participants as identified on the Notice of Electronic

Filing ("NEF").

/s/ Mark H. Burak
Mark H. Burak

44155900.4